State of WEST VIRGINIA, by Darrell V. McGRAW, Jr., Attorney General, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; Tommy G. Thompson, Secretary of the United States Department of Health and Human Services; and Michael McMullen, Administrator, Health Care Financing Administration, Defendants.

Civ.A. No. 2:98–1150.

United States District Court, S.D. West Virginia, Charleston Division.

March 7, 2001.

As Corrected March 14, 2001.

---

12. *Id.*

13. See # 3, *supra.*

14. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

15. *Id* at 687, 104 S.Ct. 2052.

16. *Id* at 693, 104 S.Ct. 2052.

Silas B. Taylor, Senior Deputy Attorney General, Office of the Attorney General of the State of West Virginia, Charleston, WV, for plaintiff the State of West Virginia by Attorney General Darrell V. McGraw, Jr.

Rebecca A. Betts, United States Attorney, Michael L. Keller, Assistant United States Attorney, Office of the United States Attorney for the Southern District of West Virginia, Charleston, WV, Sheila M. Lieber, Vesper Mei, United States Department of Justice, Civil Division, Washington, DC, Stuart E. Schiffer, Deputy Assistant Attorney General, David S. Cade, Acting General Counsel, Sheree R. Kanner, Chief Counsel for Health Care Financing, Henry R. Goldberg, Deputy Chief Counsel for Litigation, Linda Banks, United States Department of Health and Human Services, Washington, DC, for defendants the United States Department of Health and Human Services et al.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the court are the plaintiff's Motion for Preliminary Injunction and the parties' cross-motions for summary judgment. The plaintiff filed this suit against the United States Department of Health and Human Services ("DHHS"), its then-Secretary, Donna Shalala and then-Administrator of the Health Care Financing Administration ("HCFA"), Nancy–Ann Min DeParle,[1] asking the court to declare that the 1993 amendments to 42 U.S.C. § 1396p are unconstitutional and to enjoin the defendants from enforcing the amendments. At issue is the requirement in these amendments that states recover from the estates of certain Medicaid recipients reimbursements for nursing home and other long-term care benefits (hereinafter the "estate recovery program").

West Virginia, by its Attorney General, argues in effect that conditioning receipt of Medicaid funds upon the implementation of an estate recovery program is an unacceptable Hobson's choice. Thomas Hobson, an English liveryman, required his customers to take the horse nearest the stable door or none. If one needed a horse, he had to take the one offered. West Virginia desperately needs Medicaid funding. Read in the harshest way, the amendments say: Take the funding that requires you to implement an estate recovery program or take no funding at all. The question before the court is whether Congress can put the matter to the State of West Virginia in such a way. Can Congress, consistent with the Constitution, require West Virginia to implement an estate recovery program as a condition precedent to the receipt of Medicaid funds?

For the following reasons, the court **FINDS** that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. The court **GRANTS** the defendants' Motion for Summary Judgment, **DENIES** the plaintiff's Motion for Summary Judgment and **DENIES AS MOOT** the plaintiff's Motion for Preliminary Injunction.

## I. HISTORY OF MEDICAID AND ESTATE RECOVERY

In 1935, the United States Congress enacted the Social Security Act as "a series of related measures designed as a unified, well-rounded program of attack upon the principal causes of insecurity in our economic life." S.Rep. No. 628, 74th Cong., 1st Sess. 2 (1935). The Act covered five broad categories: old-age security, unemployment compensation, aid to dependent children, public health measures and aid to the blind. *See Oklahoma v. Schweiker*, 655 F.2d 401, 403 (D.C.Cir.1981). "Under the various titles of the Act, the federal government reimbursed the states for part of the cost of cash payments made to assist the needy in acquiring food, shelter and medical care. The states administered the programs and determined the levels of assistance, but they had to comply with

---

**1.** Tommy G. Thompson, the current Secretary of the DHHS and Michael McMullen, the current Administrator of the HCFA are here-by substituted pursuant to Fed.R.Civ.P. 25(d)(1).

various federal requirements in order to receive federal matching funds." *Id.*

In 1965, Congress passed amendments to the Social Security Act. These amendments created the Medicaid program, the largest federal-state matching fund program in existence, which authorized states to set up comprehensive plans for supplying medical services to indigents. In accordance with the plans, the states reimburse health care providers for the cost of medical care furnished to Medicaid recipients, and the states in turn recoup a portion of their expenditures from the federal government. *Id.* To qualify for Medicaid, applicants must show they are aged, blind, disabled or the parent of a minor child, and that their income and resources are insufficient to meet the costs of necessary care and services, according to program criteria, which are found at 42 U.S.C. § 1396a (1994). *See* John Bigler, Diane Archer & John Regan, *An Overview of Social Security, Medicare and Medicaid,* 65 N.Y.ST.B.J. 14, 18 (1993); *see also Atkins v. Rivera,* 477 U.S. 154, 156, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986). However, in determining eligibility, an applicant's home is excluded as a countable resource, thus allowing someone with a potentially valuable asset to receive benefits along with those who have greater financial need.[2] Congress addressed this anomaly through estate recovery.

The legislative history of the estate recovery program reflects Congress's salutary purpose of maximizing the amount of money available to those who absolutely cannot afford medical and nursing care. Prior to 1993, states were permitted, but not required, to establish estate recovery

programs. *See* Pub.L. No. 89–97 (July 30, 1965); *see also* Pub.L. No. 97–248 § 132, 96 Stat. 324 (1982). Congress passed the estate recovery provision as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) to counterbalance rocketing Medicaid expenditures and overall budget and deficit reductions. Ira Stewart Wiesner, *OBRA '93 and Medicaid, Asset Transfer, Trust, Availability, and Estate Recovery Statutory Analysis in Context,* 47 Soc.Sec.Rep.Serv. 757, 758 (1995). Congress sought a way to stymie the growth in state Medicaid expenditures without depriving eligible recipients of much-needed care. *Id.* Thus, although states could allow Medicaid recipients to retain their homes during their lifetime, Congress began requiring states to recoup benefits from the estates of certain deceased Medicaid recipients as a condition of receiving Medicaid funds. OBRA '93 § 13611(a), 107 Stat. at 622 (amending Social Security Act § 1917(c)(1), 42 U.S.C. § 1396p(c)(1) (1989)).

Specifically, OBRA '93 required that each State include in its State Plan a provision for making recoveries from the estates of Medicaid recipients who: 1) permanently reside in nursing facilities, medical institutions, or intermediate care facilities for the mentally retarded; 2) who receive home- or community-based services, or any long-term care services after the age of 55; and 3) who have received or are entitled to receive benefits under a long-term care insurance policy. 42 U.S.C. § 1396p(b)(1). States failing to participate in the estate recovery program risk losing all or part of their Medicaid funding. 42 U.S.C. § 1396c.[3]

---

**2.** The Supplemental Security Income ("SSI") program excludes an individual's principal residence from consideration as a countable resource. *See* 42 U.S.C. § 1382b(a)(1). SSI rules generally govern Medicaid eligibility of the aged, blind and disabled. Thus, this exclusion also applies to Medicaid. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(II), 1396a(a)(10)-(A)(ii)(V) and 1396a(a)(10)(A)(ii)(III); 20 C.F.R. § 416.1212.

**3.** The Medicaid Act contains a provision which governs the failure to substantially comply with any of the provisions contained therein, including the amendments concerning the estate recovery program. 42 U.S.C.A. 1396c provides:

> If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the adminis-

OBRA '93 does not force estate recovery upon any citizen of a state. Persons subject to estate recovery elect to receive Medicaid benefits and the regulations demand that such recipients receive notice of the estate recovery requirement when choosing to accept or reject Medicaid long-term care benefits. *See* State Medicaid Manual, § 3810(I), Hcfa.Pub. 45–3 (September 1994) (*"General Notice* —You should provide notice to individuals at the time of application for Medicaid that explains the estate recovery program in your State.") Additionally, the statute safeguards a home from recovery if it is needed for the support of a spouse or dependent child. *See* 42 U.S.C. 1396p(b)(2); *see also* State Medicaid Manual § 3810(A)(4), Hcfa.Pub. 45–3. Furthermore, estate recovery may be waived in individual situations in which undue hardship can be shown. *See* State Medicaid Manual § 3810(C), HcfaPub. 45–3 ("Where estate recovery would work an undue hardship, adjustment or recovery is waived.")

Until 1995, West Virginia law did not provide for estate recovery. However, in 1995, West Virginia enacted West Virginia Code section 9–5–11c, which authorized the state Department of Health and Human Resources to implement the estate recovery program. The legislature included a provision that directed the state Attorney General to commence an action to determine the validity of the estate recovery program and to determine whether the federal mandate was constitutional. Three years later, the Attorney General filed this suit, arguing that the choice of implementing an estate recovery program or losing all or part of desperately needed Medicaid

funds is so coercive as to make the requirement unconstitutional and violate the Tenth Amendment.

## II. DISCUSSION OF LAW

█ The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States, by the Constitution, nor prohibited by it to the States are reserved to the States respectively, or the people." U.S. Const., amend X. As a general matter, the Tenth Amendment is not implicated when Congress acts pursuant to one of its enumerated powers. Certain powers, which are specifically enumerated in the Constitution, have been broadly interpreted to provide Congress with substantial latitude in regulating areas which might otherwise be left to the states. "[O]ur Constitution ... authorizes some enumerated powers that are broad enough to allow congressional control over any aspect of human affairs." Robert F. Nagel, *The Future of Federalism,* 46 Case W.Res.L.Rev. 643, 649 (1996). If a power is constitutionally delegated to Congress, "the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

█ The power to spend for the general welfare is one such enumerated power. The Spending Clause reads: "The Congress shall have Power to lay and collect Taxes, Duties, Imports and Excises, to pay the debts and provide for the common Defense and general Welfare of the United States." U.S. Const., art. 1, § 8, cl. 7. Incident to its power under the Spending

tration of the State plan approved under this subchapter, finds—
(1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or
(2) that in the administration of the plan there is a failure to comply substantially with any such provision;
the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that pay-

ments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).
42 U.S.C.A. § 1396c.

Clause, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). Congress's conditioning of the states' receipt of Medicaid funds on the implementation of an estate recovery program was an exercise of the spending power.

■ A valid spending condition must meet five requirements. First, the condition must be "in pursuit of the general welfare." Second, the condition must be unambiguously stated, so that a state may knowingly exercise a choice to participate, all the while cognizant of the consequences. Third, the condition must be related to the federal interest involved in the particular project or program. Fourth, the condition cannot be barred by some other constitutional provision. Fifth, the condition must not be unconstitutionally coercive. *See Dole*, 483 U.S. at 207–208, 107 S.Ct. 2793; *see also Litman v. George Mason Univ.*, 186 F.3d 544, 552–53 (4th Cir.1999).

■ The court **FINDS** that the estate recovery program clearly meets the first four requirements. Congress's exercise of the spending power in this regard is in the pursuit of the general welfare and it relates to the federal interest in the continuation of providing long-term care and services to the needy through the Medicaid program. Furthermore, the statute clearly and unambiguously states that a lien is placed on the property of specified Medicaid recipients. Further, the State is charged with promulgating a collection or recovery procedure and the statute clearly sets forth the penalty for failure to do so. Additionally, no other constitutional provision acts as an independent bar to the conditional grant of these federal funds.

*Dole*, 483 U.S. at 207–208, 107 S.Ct. 2793. Having found that the estate recovery program meets the first four factors, the court now turns to the coercion question.

■ It is hard to imagine a choice more coercive of a responsible state government than conditioning Medicaid funds upon West Virginia's implementation of an estate recovery program. West Virginia does not have the resources to educate its children, pave and repair its state roads, or even provide food to all who need it without help. Certainly, the state cannot afford to pay the medical bills of all its needy citizens. The state has become increasingly dependent on Medicaid funds. Seventy-five percent of the total cost of nursing home care comes from the Medicaid program. Medicaid provides more than ninety percent of the cost for long-term care for the mentally retarded, behavioral health centers, and home and community medical services. Medicaid expenditures doubled from 1992–1997 and now exceed $1.2 billion annually.

There is support for the notion that a particular financial offer by the federal government may be so coercive as to be compulsive and, thus, presumably unconstitutional. This idea was first advanced by the United States Supreme Court in *Chas C. Steward Machine Company v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). In that case, the Court suggested that a financial inducement offered to a state *might* be "exertion of a power akin to undue influence,"' but left unresolved whether the coercion concept could "ever be applied with fitness to the relations between state and nation." *Id.*

In *South Dakota v. Dole*, the Supreme Court concluded that "it would only find Congress's use of its spending power impermissibly coercive, *if ever*, in the most extraordinary circumstances." *California v. United States*, 104 F.3d 1086, 1092 (9th Cir.1997) (emphasis added) (interpreting *South Dakota v. Dole*, 483 U.S. 203, 210–211, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)).

Since *Steward*, no court has invalidated a funding condition as being coercive. *See, e.g., Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir.1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party."); *see also Oklahoma v. Schweiker*, 655 F.2d 401, 406 (D.C.Cir.1981) ("We have been unable to uncover any instance in which a court has invalidated a funding condition.").[4]

The coercion theory was also raised in *California v. United States*, a case strikingly similar to the case at bar. The State of California challenged the constitutionality of a federal measure conditioning the receipt of Medicaid funds on the states' agreement to provide emergency medical services to illegal aliens. *California v. United States*, 104 F.3d 1086, 1092 (9th Cir.1997). The Ninth Circuit held that the condition met the first four factors of a valid spending condition, finding that such spending was in furtherance of the general welfare, that the condition was unambiguously stated, that it was reasonably related to the federal interest in the Medicaid program and that there was no other constitutional bar to the conditional grant of funds. *Id.* at 1092. The State of California did not dispute those findings. However, relying on the coercion doctrine, California argued that, while its initial choice

to participate in the Medicaid program was voluntary, *see Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), it was required to remain in the program in order to prevent a collapse of its medical system. The Ninth Circuit rejected that argument and held that "to the extent that there is any viability left in the coercion theory, it is not reflected in the facts of this record." [5] *Id.*

The Fourth Circuit Court of Appeals has also discussed coercion as a limitation on the spending power, but has never found a condition placed on a spending bill to be unconstitutionally coercive. In *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir.1996). Virginia mounted Tenth Amendment and spending power challenges to a sanction, imposed under the Clean Air Act (CAA), which threatened to withhold federal highway funding if the states did not implement an appropriate plan for issuing air-pollution permits. The court held that, although the sanctions under the CAA potentially burden the states, they do not amount to "outright coercion," and that "more severe funding restrictions than those at issue here have been upheld." *Id.* at 881–82; *see Litman v. George Mason*, 186 F.3d at 555. *But see Commonwealth of Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 570 (4th Cir.1997).[6]

4. In *Oklahoma v. Schweiker*, the D.C. Circuit rejected the State of Oklahoma's argument that a condition on the receipt of Medicaid funds requiring states to maintain certain levels of payments to the Social Security Income (SSI) program (known as the "pass-through provision") is unconstitutionally coercive because the potential penalty, loss of Medicaid funds, is "so drastic that the states have no choice but to comply." *Id.* at 413. The court held that the "pass-through provision" was a valid exercise of Congress's spending power.

5. The court notes that the opinion in this matter was authored by Senior District Judge Robert R. Merhige, Jr., District Judge for the Eastern District of Virginia, who was sitting by special designation.

6. *Riley* overruled a decision by the United States Department of Education to cut off all funding to the Commonwealth of Virginia un-

der the Individuals with Disabilities Education Act (IDEA) if the state did not provide free education to disabled students who had been suspended or expelled for reasons not related to their disability. In a badly splintered *en banc* opinion, Chief Judge Wilkinson and Judges Russell, Widener, Wilkins, Luttig and Williams voted to reverse and to adopt the dissenting panel opinion filed by Judge Luttig. Judge Luttig's panel dissent held that, if the court had not found that the statute did not clearly and unambiguously express that the state was required to provide a free education to disabled students who had been suspended or expelled from school, a substantial constitutional question under the Tenth Amendment would have been presented. 106 F.3d at 561.

Professor Kathleen Sullivan writes in her excellent article, *Unconstitutional Conditions,* 102 HARV.L.REV. 1413 (May 1989):

> Directly and through metaphors of duress or penalty, the Court has repeatedly suggested that the problem with unconstitutional conditions is their coercive effect. Yet the Court's unconstitutional conditions rulings display serious inconsistencies in their account of coercion. The Court has never satisfactorily refuted the argument that offers of conditioned benefits expand rather than contract the options of the beneficiary class, and so present beneficiaries with a free choice. Even assuming that the choice such offers present is less than free, the Court has never developed a coherent rationale for determining when such offers rise to the level of "coercion".... [A]lthough the Court frequently treats coercion as a matter of mere description or measurement—conditions become unconstitutional when they pass the point at which "pressure turns into compulsion"—such an empirical account of coercion is unsustainable.... [A]ny useful conception of coercion is irreducibly normative. Without a theory of autonomy, utility, fairness, or desert, one cannot tell when choice has been wrongfully constrained.

*Id.* at 1428 (internal citations omitted).

> Both private law analogies and philosophical analysis of coercive offer problems.... help to show why a coercion approach is unlikely to be helpful in the unconstitutional conditions context.... [B]oth private law and moral philosophy commonly depict some offers of benefit as coercive. But coercion in these settings is inevitably normative, not merely descriptive, empirical, or psychological. It necessarily embodies a conclusion about the wrongfulness of a proposal, not merely the degree of constraint it imposes on choice. It therefore depends on underlying theories of autonomy, utility, fairness, or desert. The effort to locate a point at which government benefit conditions rise to the level of coercion cannot succeed in the absence of such a theory. Yet such a theory is so difficult to derive from post–1937 constitutional jurisprudence that coercion seems an illusory escape route from the problem of unconstitutional conditions.

*Id.* at 1442–43 (internal citations omitted).

The Supreme Court admonished courts "to avoid becoming entangled in ascertaining the point at which federal inducement to comply with a condition becomes compulsion." *See Oklahoma v. Schweiker,* 655 F.2d at 413 (citing *Chas C. Steward Machine Company v. Davis,* 301 U.S. at 589–90, 57 S.Ct. 883). In light of the failure of any court to find that point and in consideration of Professor Sullivan's suggestion that "such an empirical account of coercion is unsustainable," Sullivan, *supra,* at 1428, the court rejects the argument of the State of West Virginia that its statutory election of an estate recovery program was unconstitutionally coerced. The court **FINDS** upon the record before it that the implementation of an estate recovery program as a condition of receiving Medicaid funds is constitutional.

## III. CONCLUSION

The State has demonstrated that the estate recovery condition upon Medicaid funding results in harsh consequences to West Virginians who are marginally poor. Nonetheless, this court's role is limited to deciding the constitutionality of the statutory scheme and does not extend to an appraisal of the policy choices of Congress. Consistent with that understanding of its function, the court **FINDS** upon the record of this case that the estate recovery program is a constitutionally valid condition placed upon Medicaid funding pursuant to Congress's spending power. The court **GRANTS** the defendants' Motion for Summary Judgment, **DENIES** the plaintiff's Motion for Summary Judgment and **DENIES AS MOOT** the plaintiff's Motion for

Preliminary Injunction. A separate judgment order accompanies this Order.

The court **DIRECTS** the Clerk to (1) send a copy of this Order to counsel of record and any unrepresented parties, and (2) publish this opinion at www.wvsd.uscourts.gov.