PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STATE OF WEST VIRGINIA; DARRELL
V. MCGRAW, JR.,
            *Plaintiffs-Appellants,*

                v.

U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES,
                *Defendant-Appellee,*

                and

DONNA E. SHALALA SECRETARY,          No. 01-1443
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
NANCY-ANN MIN DEPARLE,
Administrator, Health Care
Financing Administration,
                *Defendants.*

ROBERT A. BAILEY,
                *Amicus Curiae.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph Robert Goodwin, District Judge.
(CA-98-1150-2)

Argued: October 31, 2001

Decided: May 7, 2002

Before WILLIAMS and TRAXLER, Circuit Judges, and
Malcolm J. HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Judge Williams and Judge Howard joined.

---

**COUNSEL**

**ARGUED:** Silas Bent Taylor, Senior Deputy Attorney General, WEST VIRGINIA ATTORNEY GENERAL'S OFFICE, Charleston, West Virginia, for Appellants. Mark Bernard Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Stuart E. Schiffer, Acting Assistant Attorney General, Charles T. Miller, United States Attorney, Michael S. Raab, Vesper Mei, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Michael A. Bailey, Clarksburg, West Virginia, Amicus Curiae.

---

**OPINION**

TRAXLER, Circuit Judge:

The State of West Virginia brought this action against the United States Department of Health and Human Services and its Secretary (together, "HHS") challenging, on Tenth Amendment grounds,[1] the constitutionality of amendments to the federal Medicaid program that require West Virginia to adopt a program to recover certain Medicaid expenditures from the estates of deceased Medicaid beneficiaries. The district court granted summary judgment in favor of HHS, *see West Virginia v. United States Dep't of Health & Human Servs.*, 132 F. Supp. 2d 437 (S.D.W. Va. 2001), and West Virginia appeals. We affirm.

---

[1]The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

## I.

## A.

The Medicaid program, 42 U.S.C.A. §§ 1396, 1396a-v (West 1992 and Supp. 2001), established as part of the Social Security Act in 1965, "is a cooperative federal-state public assistance program that makes federal funds available to states electing to furnish medical services to certain impoverished individuals." *Mowbray v. Kozlowski*, 914 F.2d 593, 595 (4th Cir. 1990); *see also Harris v. McRae*, 448 U.S. 297, 301 (1980). If a state elects to participate in the Medicaid program, it must submit a Medicaid plan to HHS for approval. If the plan is approved by HHS, the state is then entitled to reimbursement from the federal government of a certain percentage of the costs of providing medical care to eligible individuals—the "Federal medical assistance percentage" ("FMAP").[2] 42 U.S.C.A. § 1396b(a)(1) (West Supp. 2001); *see generally Atkins v. Rivera*, 477 U.S. 154, 156-57 (1986). If a state fails to comply with the requirements imposed by the Medicaid Act or by HHS, the state risks the loss of all or a part of its FMAP. *See* 42 U.S.C.A. § 1396c (West 1992); *Bowen v. Massachusetts*, 487 U.S. 879, 885 (1988). West Virginia currently receives more than $1 billion in Medicaid funds from the federal government each year.

When determining whether an individual is eligible for Medicaid benefits, the value of the individual's home is usually excluded.[3] As

---

[2]Each state's FMAP is determined by a statutory formula that establishes a reimbursement rate of between 50% and 83% and gives higher reimbursement rates to states with lower per-capita incomes. *See* 42 U.S.C.A. §§ 1396b(a)(1), 1396d(b) (West Supp. 2001). For fiscal year 2002, West Virginia's FMAP is approximately 75%; only Mississippi's FMAP is higher. *See Federal Financial Participation in State Assistance Expenditures*, 65 Fed. Reg. 69560, 69561 (Nov. 17, 2000).

[3]The Supplemental Security Income ("SSI") program generally excludes an individual's principal residence when calculating SSI eligibility. *See* 42 U.S.C.A. § 1382b(a)(1) (West Supp. 2001). The Medicaid Act incorporates this exclusion. *See* 42 U.S.C.A. §§ 1396a(a)(10)(A)(i)(II) (West Supp. 2001); 1396a(a)(10)(A)(ii)(V) (West Supp. 2001); 1396a(a)(10)(C)(i)(III) (West Supp. 2001).

the district court explained, the effect of this exclusion is to allow "someone with a potentially valuable asset to receive benefits along with those who have greater financial need. Congress addressed this anomaly through estate recovery." *West Virginia*, 132 F. Supp. 2d at 440 (footnote omitted).

Before 1993, the Medicaid Act permitted states, under certain circumstances, to recover medical costs paid by Medicaid from the beneficiary's estate. In 1993, however, in the face of rapidly escalating medical-care costs, Congress amended the act to *require* states to recover certain Medicaid costs from the estates of certain deceased beneficiaries. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13612, 107 Stat. 312, 627-28 (codified at 42 U.S.C.A. § 1396p(b)(1) (West Supp. 2001)). In West Virginia, potential beneficiaries are required to "spend down" their income and assets before they become eligible for benefits. Thus, the home (exempted from eligibility requirements) typically is the only significant asset subject to the estate recovery provisions.

In general terms, the estate recovery provisions apply only to individuals who are permanently institutionalized or who began receiving nursing-home or other long-term care services after age 55. *See* 42 U.S.C.A. § 1396p(b)(1) (West Supp. 2001). The provisions do not take effect while there is a surviving spouse or dependent child of the beneficiary, *see* 42 U.S.C.A. § 1396p(b)(2) (West Supp. 2001), and may be waived in cases where they "would work an undue hardship," *see* 42 U.S.C.A. § 1396p(b)(3) (West Supp. 2001). Potential Medicaid beneficiaries are informed of the estate recovery provisions before they elect to accept Medicaid benefits. *See* J.A. 298-99.

From the funds collected from the estates, the federal government is credited with a percentage equal to the state's FMAP, and the state retains the balance. When the mandatory estate recovery provisions were enacted, Congress expected that the federal government would realize savings of $300 million over five years. The federal government has in fact realized even greater savings—more than $100 million in 1999 alone. *See* J.A. 53; Brief of Appellee at 7-8.

Sixteen thousand West Virginians receive Medicaid services that subject them to the mandatory estate recovery program. The annual

cost of providing these services is approximately $425 million, of which approximately $320 million is paid by the federal government. *See* Brief of Appellant at 17. The average estate recovery claim in West Virginia is approximately $50,000.00, but the amount actually recovered averages only $14,000. In West Virginia, the estate recovery program yields gross proceeds of approximately $2.5 million annually, approximately 75% of which must be credited to the federal government. *See* Brief of Appellant at 12-13, n.8. The annual amount recovered in West Virginia through the estate recovery program is thus approximately two-tenths of one-percent of the more than $1 billion in Medicaid funds received by the state each year.

### B.

Simply put, the State of West Virginia believes that the estate recovery program is bad public policy that yields little in terms of dollars actually recovered but creates substantial non-financial problems, such as "widespread clinical depression in aged and disabled nursing home residents." Brief of Appellant at 11. The program generally affects the poorest segment of the elderly population, those who cannot afford to buy long-term care insurance and those who cannot afford or do not appreciate the need for the legal advice necessary to engage in the various forms of estate-planning that can protect certain assets while retaining Medicaid eligibility. During oral argument, West Virginia described the program as a "betrayal of the New Deal," in that the federal government promised it would take care of its citizens, yet never suggested that the elderly and destitute would later be required to forfeit the homes for which they had worked so diligently.

West Virginia officials thus initially resisted implementing the estate recovery program, and no legislation was passed in the 1994 legislative session, as required by the 1993 Medicaid amendments. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13612(d), 107 Stat. 312, 628-29. Thereafter, HHS notified West Virginia that it would initiate "compliance proceedings" against the state that "could result in West Virginia losing all or part of its Federal financial participation in the State's Medicaid Program." J.A. 155.

The HHS warning had its desired effect, and the West Virginia legislature during the next legislative session authorized an estate recov-

ery program. *See* W. Va. Code § 9-5-11c. West Virginia's opinion about the estate recovery program, however, did not change, and the legislation authorizing the program also directed West Virginia's attorney general to "commence an action in a court of competent jurisdiction to test the validity, constitutionality, and the ability of the Congress of the United States to mandate the implementation" of the estate recovery program. W. Va. Code § 9-5-11c(g). Complying with that statutory directive, West Virginia's attorney general brought this action.

## II.

As a general rule, Congress may use its broad powers under the Spending Clause to induce the states to behave in a certain way, by offering federal funds to states that agree to certain congressionally imposed conditions. *See New York v. United States*, 505 U.S. 144, 168 (1992) (explaining that attaching conditions to funds disbursed under the Spending Clause is a "permissible method of encouraging a State to conform to federal policy choices"); *Maryland Psychiatric Soc'y, Inc. v. Wasserman*, 102 F.3d 717, 719-20 (4th Cir. 1996) ("By virtue of its spending power, Congress is permitted to condition receipt of federal funds upon certain state actions."). As the Supreme Court has explained, this use of the spending powers respects the autonomy of the states and the limited authority conferred on the federal government by the Constitution:

> [T]he residents of the State retain the ultimate decision as to whether or not the State will comply [with the conditions imposed on the receipt of federal funds]. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant. If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program, and they may continue to supplement that program to the extent state law is not pre-empted. Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the

local electorate's preferences; state officials remain account-
able to the people.

*New York*, 505 U.S. at 168.

There are, of course, certain limits to the federal government's
spending powers. "Federal expenditures must (1) benefit the general
welfare, and the conditions imposed on their receipt must be (2)
unambiguous, (3) reasonably related to the purpose of the expendi-
ture, and (4) cannot violate any independent constitutional prohibi-
tion." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d
323, 326 (4th Cir. 2001) (internal quotation marks omitted); *see New
York*, 505 U.S. at 171-72. In addition, the Supreme Court has cau-
tioned that "in some circumstances the financial inducement [to com-
ply with a condition imposed upon the receipt of federal funds]
offered by Congress might be so coercive as to pass the point at
which pressure turns into compulsion." *South Dakota v. Dole*, 483
U.S. 203, 211 (1987) (internal quotation marks omitted). Thus, while
Congress may use its spending powers to encourage the states to act,
it may not coerce the states into action. If the Congressional action
amounts to coercion rather than encouragement, then that action is not
a proper exercise of the spending powers but is instead a violation of
the Tenth Amendment. *See New York*, 505 U.S. at 156 ("If a power
is delegated to Congress in the Constitution, the Tenth Amendment
expressly disclaims any reservation of that power to the States...."); 
*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("As long as it is act-
ing within the powers granted it under the Constitution, Congress may
impose its will on the States."); *Gillespie v. City of Indianapolis*, 185
F.3d 693, 704 (7th Cir. 1999) ("Whether Congress has invaded the
province reserved to the States by the Tenth Amendment is . . . a
question that must be answered by inquiring whether Congress has
exceeded the limits of authority bestowed upon it by Article I of the
Constitution.").

West Virginia does not contend that the estate recovery provisions
fail to satisfy the general spending clause requirements set forth
above. Instead, West Virginia argues only that the estate recovery
provisions are unduly coercive and therefore violate the Tenth
Amendment. Its argument in this regard is fairly straightforward.

West Virginia willingly agreed to participate in the Medicaid program in 1965, when the program was established. At that time, states were not required to recover expenses from the estates of deceased beneficiaries. To meet the requirements of the Medicaid program, West Virginia was required to expand and improve its medical infrastructure. The state funded these improvements through the issuance of long-term development bonds to be paid primarily through anticipated Medicaid reimbursements. Almost thirty years later, however, Congress changed the rules of the game and required the states to implement an estate recovery plan, a policy with which West Virginia strongly disagrees.[4] Given its poverty rate and high percentage of elderly residents, West Virginia is unusually dependent on federal Medicaid dollars—nationally, approximately 15% of the population is covered by Medicaid, but 20% of West Virginians are covered. *See* Brief of Appellant at 14. West Virginia contends that because the federal government has "co-opted the tax-base," Brief of Appellant at 13, West Virginia cannot realistically replace lost Medicaid funds by increasing taxes on its citizens.[5] According to West Virginia, if federal Medicaid funds were withdrawn, West Virginia's health care system would effectively collapse. Thus, faced with the federal government's threat to withdraw Medicaid funding, West Virginia argues it had no choice but to comply by implementing an estate recovery program. West Virginia therefore argues that the federal government's requirement that it adopt an estate recovery program violates the Tenth Amendment.

The district court suggested that the estate recovery provisions

---

[4]West Virginia so strongly opposes the estate recovery program that it asserts that "had West Virginia . . . been told that its failure to implement Estate Recovery would require it to replace with state funds the minuscule federal revenues thereby lost, it would gladly have done so to protect its aged and disabled citizens from the 'harsh consequences' of Estate Recovery." Brief of Appellant at 26.

[5]The federal government's tax receipts now amount to approximately 20% of the country's gross domestic product, more than double the level of 1940. *See* J.A. 255. West Virginia thus argues that "Congress ha[s] consumed a disproportionate share of the available tax base," Reply Brief of Appellant at 4, which, particularly in light of West Virginia's high poverty rate, effectively prevents West Virginia from raising state taxes.

might be coercive, *see West Virginia*, 132 F. Supp. 2d at 442, but the court nonetheless rejected West Virginia's Tenth Amendment argument, stating that "[t]he Supreme Court [has] admonished courts to avoid becoming entangled in ascertaining the point at which federal inducement to comply with a condition becomes compulsion." *Id.* at 444 (internal quotation marks omitted). On appeal, West Virginia contends that the district court effectively concluded that a Tenth Amendment claim based on the coercion theory is not viable, even though six judges of this court indicated their acceptance of the theory in *Virginia Department of Education v. Riley*, 106 F.3d 559, 569-72 (4th Cir. 1997) (en banc) (opinion of Luttig, J., in which Wilkinson, C.J., and Russell, Widener, Wilkins, and Williams, JJ., joined). We agree with West Virginia that, while the district court's treatment of the coercion theory finds support in cases from other circuits, it is inconsistent with the views expressed by six judges in *Riley*. Nonetheless, as we explain later, we conclude that the district court properly granted summary judgment to HHS.

Other circuits have expressed strong doubts about the viability of the coercion theory. *See Kansas v. United States*, 214 F.3d 1196, 1202 (10th Cir. 2000) ("[T]he coercion theory is unclear, suspect, and has little precedent to support its application."); *California v. United States*, 104 F.3d 1086, 1092 (9th Cir. 1997) ("[T]o the extent that there is any viability left in the coercion theory, it is not reflected in the facts of this record."); *Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir. 1989) ("The difficulty if not the impropriety of making judicial judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between federal and state governments."); *Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C. Cir. 1981) ("The courts are not suited to evaluating whether the states are faced here with an offer they cannot refuse or merely with a hard choice. . . . We therefore follow the lead of other courts that have explicitly declined to enter this thicket when similar funding conditions have been at issue.").

We acknowledge that the coercion theory is somewhat amorphous and cannot easily be reduced to a neat set of black-letter rules of application. The Supreme Court recognized as much in *Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548 (1937). In *Steward Machine*, the Court upheld the constitutionality of Title IX of the

Social Security Act, concluding, *inter alia*, that the act "is not void as involving the coercion of the States in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government." *Id.* at 585. While accepting the possibility that the economic pressure inherent in a conditional funding offer might pass "the point at which pressure turns into compulsion," *id.* at 590, the Court also made the following observations:

> The difficulty with the petitioner's contention is that it confuses motive with coercion. Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. In like manner every rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems. The wisdom of the hypothesis has illustration in this case. Nothing in the case suggests the exertion of a power akin to undue influence, if we assume that such a concept can ever be applied with fitness to the relations between state and nation. Even on that assumption the location of the point at which pressure turns into compulsion, and ceases to be inducement, would be a question of degree, — at times, perhaps, of fact.

*Id.* at 589-90 (internal quotation marks and citation omitted). These observations clearly highlight the difficulties associated with the application of the coercion theory.

In addition, the Supreme Court since 1937 has not struck down a Congressional exercise of its spending powers,[6] and we are aware of

---

[6]In *United States v. Butler*, 297 U.S. 1 (1936), the Court struck down the Agricultural Adjustment Act of 1933, a New Deal-era subsidy program that offered payments to farmers who agreed to reduce their pro-

no decision from any court finding a conditional grant to be impermissibly coercive. Although the Supreme Court has more than once referred to the existence of the coercion theory, *see Dole*, 483 U.S. at 211; *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 687 (1999); *Steward Machine Co.*, 301 U.S. at 590, its cases have provided little guidance for determining when the line between encouragement and coercion is crossed.

For example, the Court in *Dole* upheld a requirement that the states raise their minimum drinking age to 21 or lose five percent of their federal highways funds. *See Dole*, 483 U.S. at 211. The Court stated that a financial inducement could amount to coercion, but merely concluded that the drinking-age statute was not coercive, without suggesting under what circumstances coercion might be found:

> When we consider, for a moment, that all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs, the argument as to coercion is shown to be more rhetoric than fact. . . .

> Here, Congress has offered relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose. But the enactment of such laws remains the prerogative of the States not merely in theory but in fact.

---

duction. The Supreme Court concluded that the act violated the Tenth Amendment because it regulated "agricultural production, a matter beyond the powers delegated to the federal government." *Id.* at 68. The court rejected the government's argument that the voluntary nature of the Act eliminated any Tenth Amendment concern, concluding that "[t]he regulation is not in fact voluntary. The farmer, of course, may refuse to comply, but the price of such refusal is the loss of benefits. . . . The power to confer or withhold unlimited benefits is the power to coerce or destroy. . . . This is coercion by economic pressure. The asserted power of choice is illusory." *Id.* at 70-71 (footnote omitted).

*Id.* at 211-12. And the *Dole* Court also repeated the observations made in *Steward Machine* about the "endless difficulties" associated with determining whether a state has been coerced. *See id.* at 211.

These oft-mentioned "endless difficulties" in applying the coercion theory have led some courts to conclude, in essence, that the theory raises political questions that cannot be resolved by the courts. For example, the Ninth Circuit stated that

> [t]he difficulty if not the impropriety of making judicial judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between federal and state governments.
>
> . . . The purpose of the coercion test is to protect state sovereignty from federal incursions. If this sovereignty is adequately protected by the national political process, we do not see any reason for asking the judiciary to settle questions of policy and politics that range beyond its normal expertise.

*Skinner*, 884 F.2d at 448 (footnote omitted). Thus, most courts faced with the question have effectively abandoned any real effort to apply the coercion theory. *See Kansas*, 214 F.3d at 1202 (rejecting the argument that a condition attached to receipt of "Temporary Aid to Needy Families" grant was impermissibly coercive); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) (rejecting with little analysis the argument that federal law requiring states accepting Medicaid funds to provide medical services to illegal aliens violates the Tenth Amendment); *California*, 104 F.3d at 1092 (rejecting California's claim that its agreement to provide emergency medical services to illegal aliens in order to continue receiving Medicaid funds was coerced because it had "no choice but to remain in the program in order to prevent a collapse of its medical system"); *Schweiker*, 655 F.2d at 414 ("The courts are not suited to evaluating whether the states are faced here with an offer they cannot refuse or merely a hard choice.").

In this circuit, however, the coercion theory is not viewed with such suspicion, but instead has been endorsed by a substantial number of the judges on this court, as evidenced by our *en banc* decision in

*Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997). *Riley* involved the Commonwealth of Virginia's challenge to the United States Department of Education's decision to withhold for one year all the funds Virginia was entitled to receive under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. §§ 1411-20 (West Supp. 2001). The department withheld the funds because it believed that Virginia had violated the IDEA by failing to provide educational services to disabled students who had been suspended or expelled for disruptive conduct unrelated to their disabilities. A majority of the *en banc* court concluded that the funds could not be withheld because the IDEA did not clearly and unambiguously impose such a condition. *See id.* at 561; *see also Dole*, 483 U.S. at 207 ("[I]f Congress desires to condition the States' receipt of federal funds, it must do so unambiguously. . . ." (internal quotations marks omitted)). What is most important to this case, however, is the Tenth Amendment concerns raised by six members of the court.

Because of the majority's interpretation of the IDEA, it was not necessary for the court to consider Virginia's Tenth-Amendment challenge to the department's decision to withhold the federal funds. Six of the thirteen judges of the *en banc Riley* court, however, believed that if the IDEA were interpreted to require Virginia to provide educational services to the expelled and suspended students, "substantial" Tenth Amendment questions would be raised. *See Riley*, 106 F.3d at 569 (opinion of Luttig, J., in which Wilkinson, C.J., and Russell, Widener, Wilkins, and Williams, JJ., joined). Writing for these judges, Judge Luttig noted that Virginia had approximately 128,000 handicapped students, of whom only 126 had been expelled or suspended. Thus, while the Department of Education challenged Virginia's treatment of only one-tenth of one percent of its handicapped students, the department withheld the entirety of its annual $60 million special education grant, "a condition considerably more pernicious than the 'relatively mild encouragement' at issue in *Dole*." *Id.* Judge Luttig elaborated:

> [I]f the Court meant what it said in *Dole*, then I would think that a Tenth Amendment claim of the highest order lies where, as here, the Federal Government . . . withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insub-

stantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign States. In such a circumstance, the argument as to coercion is much more than rhetoric; it is an argument of fact. It is, as well, an argument that the Federal Government has, in an act more akin to forbidden regulation than to permissible condition, supplanted with its own policy preferences the considered judgments of the States as to how best to instill in their youth the sense of personal responsibility and related values essential for them to function in a free and civilized society. As such, it is an argument well-grounded in the Tenth Amendment's reservation "to the States respectively, or to the people" of those "powers not delegated to the United States by the Constitution, nor prohibited by it to the States."

*Id.* at 570 (citation omitted).

This analysis, of course, cannot be viewed as the holding of the court in *Riley* given that Judge Luttig's Tenth Amendment analysis was not necessary to the disposition of the case, *see id.* at 569, and the analysis represented the views of only six judges. Nonetheless, we believe that *Riley* strongly indicates that the coercion theory remains viable in this circuit, and that federal statutes that threaten the loss of an entire block of federal funds upon a relatively minor failing by a state are constitutionally suspect. But we need not so hold, because even under the standards set forth in Judge Luttig's opinion in *Riley*, we conclude, as we explain below, that West Virginia's Tenth Amendment challenge must fail.

III.

A.

West Virginia's Tenth Amendment argument centers on its assertion that the federal government would withhold *all* of West Virginia's federal Medicaid funds unless West Virginia implemented an estate recovery program. Given that the federal government provides West Virginia with more than $1 billion in Medicaid funds each year but recovers less than $2 million each year from the estate recovery

program, West Virginia argues that the threatened penalty is so disproportionate to the effect of West Virginia's breach that it must be viewed as coercive.

If the government in fact withheld the entirety of West Virginia's FMAP because of the state's failure to implement an estate recovery program, then serious Tenth Amendment questions would be raised. *Cf. Riley*, 106 F.3d at 570 (opinion of Luttig, J.) ("I would think that a Tenth Amendment claim of the highest order lies where, as here, the Federal Government . . . withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect."). In reality, however, the government threatened to withhold "all *or part* of [West Virginia's] Federal financial participation in the State's Medicaid Program." J.A. 155 (emphasis added). This small difference in language makes all the difference in our analysis.

Once West Virginia failed to enact an estate recovery program within the time frame established by Congress, its Medicaid plan was no longer in compliance with the Medicaid Act. When the Secretary of HHS determines that a state plan or its administration fails to comply with the Act,

> the Secretary shall notify [the] State agency that further payments will not be made to the State (*or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure*), until the Secretary is satisfied that there will no longer be any such failure to comply.

42 U.S.C.A. § 1396c (West 1992) (emphasis added). The notice sent by HHS to West Virginia—that West Virginia stood to lose all or part of its Medicaid funds if it did not comply with the estate recovery provisions—thus stated the universe of possibilities established by Congress for cases involving non-compliant state plans.

Clearly then, the circumstances of this case are substantially different from those in *Riley*. Here, the federal government did not withhold (or threaten to withhold) the entirety of a substantial federal grant because of an insubstantial failing by the state. Instead, the fed-

eral government simply informed West Virginia, in language tracking that of the Medicaid Act, of the potential consequences that would flow from the failure to enact an estate recovery program. West Virginia thereafter complied with the estate recovery provisions. Thus, the question we must answer is *not* whether the federal government could withhold all of West Virginia's Medicaid funds had West Virginia not implemented an estate recovery program. That question is, at this point, a hypothetical one that is not properly before us. Instead, the question we face is whether Congress' requirement that states participating in the Medicaid program implement the estate recovery provisions or lose all or part of their FMAP is impermissibly coercive and thus violates the Tenth Amendment. As to that question, we are constrained to answer it in the negative.

West Virginia is in effect mounting a facial challenge to the constitutionality of the estate recovery provisions. West Virginia, therefore, has a very heavy burden to carry, and must show that the estate recovery provisions cannot operate constitutionally under any circumstance. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Schweiker*, 655 F.2d at 406 (stating that "one who contests congressional exercises of the spending power must show that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress" (internal quotation marks omitted)).

As noted above, the Medicaid Act gives the Secretary the ability to impose upon a non-compliant state a penalty less drastic than the withholding of the state's entire FMAP; the Secretary may instead withhold funds only from the categories that are affected by the failure. *See* 42 U.S.C.A. § 1396c. This discretion allows the Secretary to impose a penalty that is proportionate to the breach, which we believe saves the estate recovery provisions from West Virginia's Tenth Amendment challenge. While it is certainly possible that, in a given case, the sanction actually imposed by the Secretary might not be proportionate to the breach and might be constitutionally suspect, the mere possibility of a constitutional violation is insufficient to sustain a facial challenge to a statute. *See Salerno*, 481 U.S. at 745 ("The fact

that the . . . Act *might* operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (emphasis added)).

West Virginia, however, insists that the only lesser sanction permitted by the language of section 1396c is the withholding of FMAP funds for the long-term care services that subject a beneficiary to the mandatory estate recovery provisions, which in West Virginia would amount to approximately $300 million, almost one-third of the Medicaid funds West Virginia receives. West Virginia suggests that even this more limited sanction would be unconstitutional, given the meager funds collected through the estate recovery program and the devastating effect the loss of $300 million would have on West Virginia's health care system.[7]

We need not decide whether the withholding of all federal funds for West Virginia's long-term services would pass constitutional muster, because we cannot agree with West Virginia's cramped view of the Secretary's discretion to fashion appropriate penalties. If a state plan is non-compliant, section 1396c gives the Secretary the discretion to limit federal payments "to categories under or parts of the State plan not affected by [the] failure." While the Secretary might conclude that the long-term care services are the parts of the plan affected by a state's failure to implement an estate recovery program, it is entirely possible that the Secretary could properly view such a failure as affecting other aspects of the state's Medicaid plan. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (noting that Con-

---

[7]As the former director of West Virginia's Department of Health and Human Resources explained, "[b]y virtue of its high incidence of disabling disease [particularly lung cancer, black-lung disease, and other respiratory diseases] and senior citizens, West Virginia has a far greater need for long-term care services . . . than most, if not all, other states." J.A. 144. "[T]he entire infrastructure for providing long-term care in West Virginia is utterly dependent the Medicaid program," J.A. 144, such that "without federal Medicaid funding, long-term care services in West Virginia would instantly collapse throughout the State. No other aspect of the Medicaid program [is] more sensitive or vulnerable to federal Medicaid requirements." J.A. 145.

gress granted the Secretary "exceptionally broad authority" under the Medicaid statute); *see also Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (explaining that "substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it"). For example, David McNally, the deputy director of the office in charge of Medicaid financial management, stated that if a state failed to comply with the estate recovery provisions, it might be possible to withhold the federal government's administrative matching funds,[8] "on the basis the state is not properly administering the program." J.A. 290-91. Such a limited sanction could be sufficiently proportionate to the breach as to avoid any Tenth Amendment concerns. We therefore reject West Virginia's argument that the statute can only operate in an unconstitutional manner.

To the extent that West Virginia contends its actions were coerced by the mere possibility that it could lose all of its federal funds, that argument is unavailing. West Virginia suggests that had Congress imposed a more narrowly tailored penalty for failure to comply with the estate recovery provision,[9] then the program might not have been coercive. That is, had the states known up-front the precise cost of refusing to comply with the estate recovery provisions, the states could then have intelligently weighed their public policy judgments against the costs of not complying with the program in order to decide whether to implement an estate recovery program. The essence of this argument is that a federal conditional grant is per se unconstitutional unless the governing statute anticipates every way in which the conditions could possibly be violated and creates enforcement mechanisms that directly and as narrowly as possible target each potential viola-

---

[8]In addition to the FMAP, and subject to certain exceptions, the federal government reimburses the states for 50% of the costs that are "found necessary by the Secretary for the proper and efficient administration of the State plan." 42 U.S.C.A. § 1396b(a)(7) (West Supp. 2001).

[9]For example, West Virginia notes that in cases involving the overpayment of federal Medicaid funds (which results when states misspend federal funds—for example, on services not authorized by Medicaid), the Secretary may simply "disallow" the portion of the funds misspent. *See* 42 U.S.C.A. § 1316(d) (West Supp. 2001); 42 U.S.C.A. § 1396b(d)(5) (West Supp. 2001). The remedy for overpayment in such a case is thus "exactly proportionate to the breach." Brief of Appellant at 34.

tion. While such a statute almost certainly would not be found to be unduly coercive, the Medicaid Act is not coercive simply because it fails to reach this idealized standard of specificity.

The Medicaid Act is an "enormously complicated program[ ]. The system is a web; a tug at one strand pulls on every other." *Stephenson v. Shalala*, 87 F.3d 350, 356 (9th Cir. 1996). Given this complexity, there are untold ways in which a state plan might fail to comply with the Act and the governing regulations. To require the Act to create narrowly tailored enforcement mechanisms directed at each of the specific ways in which a plan might fail to comply would further complicate an already too complex statute. *See Gray Panthers*, 453 U.S. at 43 (noting that "[t]he Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction . . . makes the Act almost unintelligible to the uninitiated" (internal quotation marks omitted)); *Friedman v. Berger*, 547 F.2d 724, 727, n.7 (2d Cir. 1976) (lamenting the complexity of the Medicaid Act and its regulations and stating that "[t]here should be no such form of reference as '45 C.F.R. § 248.3(c)(1)(ii)(B)(2)' . . .; a draftsman who has gotten himself into a position requiring anything like this should make a fresh start"). Through section 1396c, Congress dealt with the myriad forms of non-compliance in an entirely reasonable manner, by setting forth in broad terms the consequences for failure to comply and explicitly granting the Secretary the discretion to determine the appropriate sanction in any given case. While Congress could have included a more limited sanction narrowly directed to failures to implement an estate recovery program, we cannot conclude that its failure to do so renders the estate recovery provisions per se unconstitutional.

Again we emphasize that our conclusions flow in large part from the fact that West Virginia is launching a facial challenge to the estate recovery provisions. If West Virginia had not implemented an estate recovery program and the Secretary had imposed a sanction, then the focus of our analysis would be different. We recognize, of course, that, in light of the amount of Medicaid funds received by West Virginia (more than $1 billion annually), this would be an extremely difficult step for the state to have taken. Nonetheless, given the posture of this case, we simply are not at liberty to assume that the cost of refusal would have been the loss of all of West Virginia's federal

reimbursement funds. *See Salerno*, 481 U.S. at 745 (explaining that for a facial challenge to succeed, "the challenger must establish that no set of circumstances exists under which the Act would be valid").

B.

West Virginia attempts to bolster its coercion argument by pointing to several observations made by Judge Luttig in his Tenth Amendment discussion in *Riley*. Judge Luttig noted that the government's decision to withhold Virginia's entire $60 million grant because the state failed to offer educational services to 126 of the state's 128,000 disabled students "begins to resemble impermissible coercion, if not forbidden regulation in the guise of Spending Clause conditions, as well." *Riley*, 106 F.3d at 569 (citations omitted). Judge Luttig also pointed out that education, the area in which the federal government was seeking to impose its wishes on Virginia, was a subject traditionally reserved to the states, *see id.* at 562, 570, 571, and that Virginia resisted the federal policy because it believed the policy to be misguided in that "it deprives the State of its most effective disciplinary and instructional tool for instilling in its especially recalcitrant students the sense of responsibility they so sorely lack." *Id.* at 571.

Tracking Judge Luttig's analysis, West Virginia argues that: (1) the federal government's requirement that it seek recovery from the estates of deceased Medicaid beneficiaries is a "'regulatory device' to compel the states to implement a federal policy judgment," Brief of Appellant at 30; (2) issues of inheritance and health care are subject matters traditionally reserved to the states; and (3) its resistance to the estate recovery program is based on West Virginia's "legitimate perception that the Estate Recovery program is bad public policy that impacts adversely upon the delivery of medical services to the aged and disabled." Brief of Appellant at 32-33. Given our conclusion that the estate recovery provisions are not facially coercive, these arguments are insufficient to establish a Tenth Amendment violation.

We agree with West Virginia that health care and inheritance are subject matters generally reserved to the states, and we assume that West Virginia truly believes that the estate recovery program is bad public policy. But points like these merely reflect basic concerns of federalism. While they might explain why a coercive federal action

will be held to violate the Tenth Amendment, they do not, in and of themselves, establish a Tenth Amendment violation. *See Litman v. George Mason Univ.*, 186 F.3d 544, 556 (4th Cir. 1999) (explaining that "in *New York [v. United States*, 505 U.S. 144 (1992),] the Court emphasized that principles of federalism do not pose an independent constitutional bar to Congress' powers under the Spending Clause"). That is, if the federal action is not impermissibly coercive and is in all other respects a proper exercise of the spending power, a Tenth Amendment violation will not be found simply because the federal action operates in an area that would otherwise be left to the states or because the action reflects what the state perceives to be a bad policy decision. *Cf. New York*, 505 U.S. at 167 (noting that "under Congress spending power, Congress may attach conditions on the receipt of federal funds" and that "[w]here the recipient of federal funds is a State, as is not unusual today, the conditions attached to the funds by Congress may influence a State's legislative choices" (internal quotation marks omitted)).

Moreover, while Congress generally may not "compel the States to enact or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997); *see New York*, 505 U.S. at 175-76, Congress may use its spending powers to encourage (but not coerce) the states to enact certain laws, *see Dole*, 483 U.S. at 207 ("[O]bjectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." (internal quotation marks and citation omitted)); *Petersburg Cellular P'ship v. Board of Supervisors*, 205 F.3d 688, 701 (4th Cir. 2000) ("[I]f Congress desires that the states themselves become involved in a suggested federal regulatory scheme, it may employ incentives to encourage the states to do so. But it cannot coerce and unilaterally erase the lines of separation." (citations omitted)) (opinion of Niemeyer, J.). Thus, the fact that compliance with the estate recovery provisions required West Virginia to enact and enforce certain laws is of no significance in and of itself, so long as the imposition of the estate recovery provisions is a proper exercise of Congress' spending powers. *Cf. South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988) ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal stan-

dards regulating that activity is a commonplace that presents no constitutional defect.").

Animating much of West Virginia's argument on appeal is its view that the estate recovery provisions violate the Tenth Amendment by forcing West Virginia to implement an unpopular federal program and forcing its officials to incur the wrath of an unhappy electorate that should instead be directed to federal officials. Ensuring that the proper officials are held politically accountable for their decisions certainly is one of the most important principles of a federalist society:

> [W]here the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished. . . . [W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.

*New York*, 505 U.S. at 168-69. But a proper exercise of the federal government's spending powers does not raise accountability questions.

If the federal incentive complies with the general spending clause requirements and cannot be considered coercive, then the ultimate political decision lies with the state. If the conditions imposed on the federal grant are repugnant to the state, the state may decline to accept the funds. *See, e.g.*, *South Dakota v. Dole*, 791 F.2d 628, 634 (8th Cir. 1986) ("Very simply, to the extent a state finds the conditions attached by Congress distasteful, the state has available to it the simple expedient of refusing to yield to what it urges is 'federal coercion.'"), *aff'd*, 483 U.S. 203 (1987). If the state, however, decides that its citizens are better served by the acceptance of the funds even though the funds come with a condition that the state would otherwise find objectionable, then it is completely proper for the state to be held

accountable for that decision. *See New York*, 505 U.S. at 168 ("Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people."). Because we have rejected West Virginia's coercion argument and West Virginia does not otherwise contend that the estate recovery provisions exceed Congress' powers under the Spending Clause, its accountability argument fails.

IV.

The Medicaid Act gives the Secretary the authority to impose a sanction short of withholding all Medicaid funds in the event a state fails to comply with the Act's estate recovery provisions. *See* 42 U.S.C.A. 1396c. Although West Virginia believed an estate recovery program was bad public policy, it nonetheless enacted such a program before the Secretary imposed any sanction for West Virginia's initial failure to timely implement an estate recovery program. Given these circumstances, the only question we decide today is whether the requirement that states implement an estate recovery program on pain of losing all or part of their Medicaid funds is impermissibly coercive on its face and therefore violates the Tenth Amendment, a question we answer in the negative. We express no opinion, however, about whether the estate recovery provisions would be constitutional if the only sanction available for states refusing to implement an estate recovery program were the loss of the state's entire Medicaid reimbursement from the federal government.

*AFFIRMED*