**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CARIN MANDERS CONSTANTINE,
             *Plaintiff-Appellant,*

v.

THE RECTORS AND VISITORS OF GEORGE
MASON UNIVERSITY; MARK F. GRADY,
in his individual capacity and his
official capacity as Dean of George
Mason Law School; DANIEL D.
POLSBY, in his individual capacity and
his official capacity as Associate Dean
for Academic Affairs; WINSTON S.
MOORE, in his individual capacity and
his official capacity as Associate Dean
for Student Academic Affairs; NELSON
LUND, in his individual capacity and
his official capacity as a Professor of
Law,
             *Defendants-Appellees,*

UNITED STATES OF AMERICA,
             *Intervenor.*

No. 04-1410

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES; THE BAZELON
CENTER, for Mental Health Law;
DISABILITY RIGHTS EDUCATION AND
DEFENSE FUND; LEGAL AID SOCIETY,
Employment Law Center; TRAINING
AND ADVOCACY SUPPORT CENTER OF THE
NATIONAL ASSOCIATION OF PROTECTION
AND ADVOCACY SYSTEMS,
             *Amici Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-03-653)

Argued: February 3, 2005

Decided: June 13, 2005

Before TRAXLER, GREGORY, and SHEDD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Shedd wrote the opinion, in which Judge Traxler and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Michael Jackson Beattie, BEATTIE & ASSOCIATES, P.L.L.C., Fairfax, Virginia, for Appellant. Kevin Kendrick Russell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. William Eugene Thro, State Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; Thomas Martin Beck, JONES DAY, Washington, D.C., for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General of Virginia, Maureen Riley Matsen, Deputy State Solicitor General, Alison Paige Landry, Senior Assistant Attorney General, Jeffrey Brandwine, Assistant Attorney General, Brian E. Walther, Assistant Attorney General, Richmond, Virginia, for Appellees. R. Alexander Acosta, Assistant Attorney General, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Civil Rights Division, Appellate Section, Washington, D.C., for Intervenor. Claudia Center, Lewis Bossing, THE LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER, San Francisco, California, for Amici Curiae Supporting Appellant.

**OPINION**

SHEDD, Circuit Judge:

Carin Constantine sued The Rectors and Visitors of George Mason University ("GMU") and several members of GMU's law school faculty (the "individual defendants"), asserting a First Amendment retaliation claim under 42 U.S.C. § 1983 and disability discrimination claims under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act. The defendants moved to dismiss the complaint on the grounds that (1) the Eleventh Amendment barred all claims against GMU and the individual defendants in their official capacities, and (2) the complaint failed to state a claim upon which relief could be granted. The district court declined to rule on the Eleventh Amendment issues but dismissed the complaint for failure to state a claim. For the reasons that follow, we reverse the district court's ruling and remand this case for further proceedings.

I.

Constantine was a student in Professor Nelson Lund's constitutional law course at GMU, a state university that receives federal funds.[1] Constantine suffered from "intractable migraine syndrome," for which she took prescription medication. While taking Professor Lund's final exam, Constantine suffered a migraine headache. She alerted exam administrators to her condition and requested additional time to complete the exam, but they refused. Constantine failed the exam. She then requested a grade appeal and re-examination, but those requests were denied as well.

Constantine complained to Professor Lund, the dean of the law school, and other law school officials about the construction of Professor Lund's exam and GMU's grade appeals process. She publicized her complaints in an article she wrote for the law school newspaper.

---

[1]Because we are reviewing the dismissal of Constantine's complaint, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to her. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

About three months after Constantine made her initial request for re-examination, and after she voiced criticism of the grade appeals process, the dean agreed to give Constantine a second chance to take Professor Lund's final exam. Because Constantine was carrying a full load of law school courses during the spring semester, the parties agreed that the re-examination would take place "sometime in June" 2003. On May 17, 2003, however, Constantine received an e-mail notifying her that she must present herself for the re-examination on May 21, 2003.

Constantine notified the dean, the law school registrar, and two other administrators that she would not be able to take Professor Lund's exam at that time because she had a conflict related to another law school course and, in any event, the dean had told her that she would be re-examined in June. These law school officials told Constantine that she should appear for re-examination at the time specified or forfeit her right to take the exam. Constantine requested an opportunity to take the exam in June, but that request was denied.

Constantine then filed this lawsuit and moved the district court for a temporary restraining order. After a hearing, the district court denied the motion. Constantine declined to take Professor Lund's exam on May 21, 2003. GMU later offered to give Constantine another chance to take Professor Lund's exam, but Constantine believes that in retaliation for her criticism of GMU's handling of her case, GMU decided in advance to give her an "F" on the exam. Constantine eventually took Professor Lund's exam, and she received an "F."

As a result of this failing grade in constitutional law, Constantine was not able to graduate on time. Delayed graduation compromised her ability to begin on time the judicial clerkship that she had previously accepted, so Constantine had to inform her judge of the failing grade and obtain special permission to start work a year later. According to Constantine, the "F" on her transcript continues to hamper her employment prospects.

Constantine sued GMU and the individual defendants in their official and individual capacities. She alleges that the defendants' failure to accommodate her physical disability violated her rights under the

ADA and the Rehabilitation Act. She further alleges that the individual defendants retaliated against her for criticizing GMU's grade appeals policies and thus violated her First Amendment right to free speech. Constantine seeks monetary damages as well as declaratory and injunctive relief.

The defendants moved to dismiss Constantine's suit, arguing that the Eleventh Amendment bars her claims against GMU and against the individual defendants in their official capacities. Further, the defendants argued that Constantine had failed to state a claim upon which relief can be granted. The district court granted the motion to dismiss under Rule 12(b)(6), ruling only that Constantine had failed to state a claim upon which relief can be granted. This appeal followed.

## II.

At the outset, the defendants contend that the district court should have considered their Eleventh Amendment arguments before ruling on the sufficiency of Constantine's allegations under Rule 12(b)(6). The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." The Supreme Court has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State," *Edelman v. Jordan*, 415 U.S. 651, 663 (1974), and the Eleventh Amendment protects "state agents and state instrumentalities" as well as the States themselves, *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

According to the defendants, Eleventh Amendment immunity is a jurisdictional issue that must be decided at the earliest stage of litigation. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). The Court held in *Steel Co.* that a federal court must determine that it has subject-matter jurisdiction over the case before it can pass on the merits of that case. *Id.* at 89-101. Rejecting the practice of some appellate courts to decide the merits of a case based on "hypothetical jurisdiction," the Court reaffirmed the principle that subject-matter jurisdiction is a necessary prerequisite to any merits

decision by a federal court: "The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects." *Id.* at 101. Thus, a federal court necessarily acts *ultra vires* when it considers the merits of a case over which it lacks subject-matter jurisdiction. *Id.*[2]

"Subject-matter jurisdiction . . . is an [Article] III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Because a federal court's subject-matter jurisdiction is created — and limited — by Article III and federal statutes, "no action of the parties can confer subject-matter jurisdiction upon a federal court," and ordinary principles of consent, waiver, and estoppel do not apply. *Id.* A federal court has an independent obligation to assess its subject-matter jurisdiction, and it will "raise a lack of subject-matter jurisdiction on its own motion." *Id.* Because subject-matter limitations "serve institutional interests," they "must be policed by the courts on their own initiative even at the highest level." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

Personal jurisdiction differs from subject-matter jurisdiction in that it reflects an individual liberty interest rather than an institutional interest; thus, "a party may insist that the limitation be observed, or he may forgo that right, effectively consenting to the court's exercise of adjudicatory authority." *Id.* at 584. The simple fact that subject-matter jurisdiction is nonwaivable, while personal jurisdiction may be waived, does not mean that subject-matter jurisdiction is somehow more fundamental: "The validity of an order of a federal court depends upon that court's having jurisdiction over *both* the subject matter *and* the parties." *Insurance Corp.*, 456 U.S. at 701 (emphasis added). Thus, a federal court may decide a straightforward question

---

[2]Although the Court had granted *certiorari* to decide a substantive question arising under the Emergency Planning and Community Right-to-Know Act, 523 U.S. at 88, it vacated the court of appeals' judgment and remanded with instructions to dismiss the complaint because the plaintiff lacked Article III standing, *id.* at 110.

concerning personal jurisdiction without first determining that it has subject-matter jurisdiction over the case. *Ruhrgas*, 526 U.S. at 588.

As the Court has interpreted and applied it, Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction. The text of the Eleventh Amendment suggests a limitation on subject-matter jurisdiction: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (stating that the "greater significance [of the Eleventh Amendment] lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III"). Like other issues relating to subject-matter jurisdiction, Eleventh Amendment immunity may be asserted at any time in litigation. *Edelman*, 415 U.S. at 678 (stating that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *In re Creative Goldsmiths of Washington, D.C., Inc.*, 119 F.3d 1140, 1144 (4th Cir. 1997) (considering an Eleventh Amendment defense raised for the first time on appeal).

Like personal jurisdiction, however, Eleventh Amendment immunity need not be raised by a court *sua sponte*, *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 515 n.19 (1982),[3] and may be waived by the State altogether, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985) (stating that "if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action"); *Clark v. Barnard*, 108 U.S. 436, 447 (1883) (characterizing the State's sovereign immunity as "a personal privilege which it

---

[3]The Supreme Court has made it clear that federal courts are not *required* to raise Eleventh Amendment issues *sua sponte*. *See Schacht*, 524 U.S. at 389 ("Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it."). We have stated in *dicta*, however, that "because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte*." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997).

may waive at pleasure"). For example, the Court has consistently held that a State's voluntary appearance in federal court effects a waiver of Eleventh Amendment immunity. *Lapides v. Board of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002); *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947); *Gunter v. Atlantic Cost Line R.R. Co.*, 200 U.S. 273, 284 (1906); *Clark*, 108 U.S. at 447. Given the potential for waiver, the Court has stated that the Eleventh Amendment "does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) ("The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction.").

The Court's treatment of an Eleventh Amendment question in *Calderon v. Ashmus*, 523 U.S. 740 (1998), further indicates that Eleventh Amendment immunity does not limit a federal court's subject-matter jurisdiction. The question presented in that case was whether inmates could sue state officials for declaratory and injunctive relief to prevent application of certain expedited-review provisions of the Antiterrorism and Effective Death Penalty Act. *Id.* at 742. The State had argued that the Eleventh Amendment barred any such suit and that granting an injunction would curtail state officials' First Amendment rights. Although the Court granted *certiorari* on both the Eleventh Amendment and First Amendment questions, it decided to address first the question, raised *sua sponte*, whether the inmate's declaratory judgment action constituted a "case or controversy" under Article III. *Id.* at 745. The fact that the Court deemed it necessary to raise and decide the Article III issue before addressing the Eleventh Amendment issue at least suggests that the Court did not consider the Eleventh Amendment issue to implicate subject-matter jurisdiction. *Cf. Ruhrgas*, 526 U.S. at 578 (noting that among jurisdictional issues there is no priority).

Difficult as it may be to describe precisely the nature of Eleventh Amendment immunity, *see Schacht*, 524 U.S. at 394 (Kennedy, J., concurring) (noting the "hybrid nature" of the Eleventh Amendment), it is at least clear that this immunity is not the kind of Article III limi-

tation on subject-matter jurisdiction that the Court considered in *Steel Co.* Thus, we reject the defendants' contention that *Steel Co.* required the district court to consider Eleventh Amendment questions before addressing the sufficiency of the allegations under Rule 12(b)(6). *See In re: Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 249-51 (3d Cir. 2003); *United States v. SCS Bus. & Technical Inst., Inc.*, 173 F.3d 890, 891 (D.C. Cir. 1999); *Parella v. Retirement Bd. of R.I. Employees' Ret. Sys.*, 173 F.3d 46, 53-57 (1st Cir. 1999); *but see United States v. Texas Tech Univ.*, 171 F.3d 279, 285-86 (5th Cir. 1999); *Seaborn v. Florida Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998).

Our analysis does not end here, however, because although Eleventh Amendment immunity is not strictly an issue of subject-matter jurisdiction, neither is it merely a defense to liability. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-45 (1993). "The very object and purpose of the [Eleventh] Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* at 146 (internal quotations omitted). Thus, like qualified immunity for state officers, "[t]he entitlement [conferred by the Eleventh Amendment] is an *immunity from suit* rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 144 (internal quotations omitted). In the qualified-immunity context, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*). Given the States' unique dignitary interest in avoiding suit, *see Alden v. Maine*, 527 U.S. 706, 713 (1999), it is no less important to resolve Eleventh Amendment immunity questions as soon as possible after the State asserts its immunity.[4]

---

[4]We recognize that certain merits issues are more easily resolved than Eleventh Amendment immunity issues. Nevertheless, the essence of the immunity is that the State cannot be sued in federal court at all, even where the claim has merit, and the importance of immunity as an attribute of the States' sovereignty is such that a court should address that issue promptly once the State asserts its immunity.

An exception to this general rule arises where the defendant asserts *both* that the federal statute at issue does not permit a suit against the State *and* if not, that Eleventh Amendment immunity bars the suit. *See Vermont Agency of Nat. Res. v. United States*, 529 U.S. 765, 778 (2000); *Strawser v. Atkins*, 290 F.3d 720, 729 (4th Cir. 2002). "When these two questions are at issue, not only is the statutory question logically antecedent to the existence of the Eleventh Amendment question, but also there is no realistic possibility that addressing the statutory question will expand the [c]ourt's power beyond the limits that the jurisdictional restriction has imposed." *Vermont Agency*, 529 U.S. at 779. Indeed, in such a case the statutory question is virtually identical to the Eleventh Amendment question: "The ultimate issue in the statutory inquiry is whether States can be sued under this statute; and the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under this statute." *Id.* The Court in *Vermont Agency* bypassed the Eleventh Amendment question because the federal statute at issue — the False Claims Act — did not authorize *qui tam* actions against the States. *Id.* at 787-88. Likewise, we avoided an Eleventh Amendment question in *Strawser* after concluding that the Medicaid statute did not authorize suits against the States for funds received as part of a global tobacco settlement. 290 F.3d at 729-30.

Independent of this *Vermont Agency* analysis, we avoided the Eleventh Amendment question in *Strawser* based on the defendants' equivocal assertion of immunity. 290 F.3d at 729-30. Although they were careful not to waive their immunity, the defendants in *Strawser* "did not insist on it," and we noted that they relied upon the Eleventh Amendment only to the extent necessary to prevent a judgment against them on the merits. *Id.* at 729. In other words, the State did not think its sovereign dignity required a ruling on Eleventh Amendment immunity if dismissal could be affirmed on statutory grounds.

Unlike *Vermont Agency* and *Strawser*, this case does not involve a challenge to the statutory basis for suit. Rather, the defendants in this case argue that the Eleventh Amendment bars the suit and if not, the allegations of the complaint are insufficient to make a *prima facie* case for relief. The question whether the allegations in the complaint are sufficient to satisfy Rule 12(b)(6) is not "logically antecedent" to the question whether the Eleventh Amendment bars this suit. Indeed,

the Court in *Vermont Agency* specifically distinguished "[t]he question whether the statute provides for suits against the States" from "the broader question whether the statute creates any private cause of action whatever, or the question whether the facts alleged make out a 'false claim' under the statute." 529 U.S. at 779. Moreover, this case is unlike *Strawser* in that the defendants here have insisted that their Eleventh Amendment defense be addressed.

For these reasons, *Vermont Agency* and *Strawser* are inapposite, and we shall first determine whether the Eleventh Amendment bars Constantine's claims against GMU and the individual defendants in their official capacities. Only if the Eleventh Amendment does not bar these claims shall we proceed to determine whether the allegations in Constantine's complaint state claims for relief under Title II of the ADA and § 504 of the Rehabilitation Act.[5]

### III.

Constantine asserts a claim under Title II of the ADA, which forbids disability discrimination in the provision of public services. 42 U.S.C. § 12132. Constantine argues that Congress abrogated the States' Eleventh Amendment immunity when it enacted Title II. Congress may abrogate the States' Eleventh Amendment immunity, but only by stating unequivocally its desire to do so and only pursuant to a valid exercise of constitutional authority. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).

### A.

The ADA provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a viola-

---

[5]With respect to Constantine's First Amendment retaliation claim under § 1983, that statute does not authorize an action against GMU or the individual defendants in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The statute does, however, authorize suit against the individual defendants in their individual capacities, and the Eleventh Amendment does not bar such a suit. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991).

tion of this chapter." 42 U.S.C. § 12202. This provision clearly and unambiguously expresses congressional intent to abrogate the States' Eleventh Amendment immunity with respect to claims brought under the ADA. *See Tennessee v. Lane*, 124 S. Ct. 1978, 1985 (2004); *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001). "The question, then, is whether Congress had the power to give effect to its intent." *Lane*, 124 S. Ct. at 1985.

B.

The ADA purports to "invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). Although the commerce power conferred by Article I of the Constitution does not authorize Congress to abrogate the States' Eleventh Amendment immunity, *Seminole Tribe*, 517 U.S. at 72-73, the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Thus, Title II of the ADA abrogates the States' Eleventh Amendment immunity only if its enactment represents a valid exercise of authority under § 5 of the Fourteenth Amendment. *Id.*

The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 of the Fourteenth Amendment authorizes Congress to enact "appropriate legislation" to enforce these substantive guarantees. Congress is empowered by § 5 not only to codify the Supreme Court's holdings concerning the rights established by the Fourteenth Amendment, but also to deter future violations of the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997). While Congress may, pursuant to § 5, enact prophylactic legislation prohibiting conduct that is "not itself unconstitutional," it may not substantively redefine Fourteenth Amendment protections. *Id.* at 519. To ensure that Congress merely enforces the Fourteenth

Amendment and does not reinterpret it, the Supreme Court has held that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

The Court in *Lane* recently applied this congruence-and-proportionality analysis to Title II of the ADA. 124 S. Ct. at 1988-94. The Court began by identifying *two* Fourteenth Amendment rights at issue in that case — the right to be free from irrational disability discrimination and the right of access to the courts. *Id.* at 1988. Importantly, the right of access to the courts is a fundamental due process right that triggers heightened judicial scrutiny. *Id.*

Having identified the relevant Fourteenth Amendment rights, the Court turned to the historical question whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination. *Lane*, 124 S. Ct. at 1988-92. Citing various federal court decisions and state statutes, the Court found that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.* at 1989. The legislative history of the ADA also included "hundreds of examples of unequal treatment of persons with disabilities by States and their political subdivisions," most of which involved discrimination in the administration of public services. *Id.* at 1990. Particularly with respect to access to the courts, the legislative history showed that "many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id.*[6] All this evidence sug-

---

[6]Although the Court in *Lane* described evidence of disability discrimination with respect to a wide variety of public services, the issue of access to the courts was critical in the analysis. The Court likened *Lane* to *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) (addressing the validity of the Family and Medical Leave Act under § 5 to remedy and deter sex discrimination in the workplace), and distinguished *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) (addressing the validity of the Age Discrimination in Employment Act under § 5 with respect to age discrimination in the workplace), and *Garrett* (addressing the validity of Title I of the ADA under § 5 with respect to disability discrimination in the workplace), because the right of access

gested that "inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Lane*, 124 S. Ct. at 1992.[7]

In determining whether Title II was an appropriate response to this pattern of unconstitutional discrimination, the Court narrowed its focus and considered the validity of Title II only as it applies "to the class of cases implicating the accessibility of judicial services." *Id.* at 1993. Even if Title II, considered as a whole, might prohibit too much otherwise constitutional conduct, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 1994. The Court specifically declined to address the question "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only [the] prohibition on irrational discrimination." *Id.* at 1994 n.20.

---

to the courts triggers heightened scrutiny. *Lane*, 124 S. Ct. at 1992. Because "Title II is aimed at the enforcement of a variety of basic rights, including the right of access to the courts at issue in this case, that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications," less evidence was required to establish a pattern of unconstitutional conduct. *Id.*

[7]In examining the backdrop of discrimination against which Congress enacted Title II, the Court specifically rejected the proposition that "a valid exercise of § 5 power must always be predicated solely on evidence of constitutional violations by the States themselves." *Lane*, 124 S. Ct. at 1991 n.16. *Compare Garrett*, 531 U.S. at 369 (stating that "it would make no sense to consider constitutional violations [by local government units], as well as by the States themselves, when only the States are the beneficiaries of the Eleventh Amendment"); *Kimel*, 528 U.S. at 90-91 (stating that congressional findings of unconstitutional discrimination in the private sector was "beside the point" since "Congress made no such findings with respect to the States"). Although evidence of misconduct by the States is of special importance, "evidence of constitutional violations on the part of nonstate governmental actors is relevant to the § 5 inquiry." *Lane*, 124 S. Ct. at 1991.

By its own terms, *Lane* does not resolve the specific question presented here — whether the accommodation requirement of Title II, as it applies to cases involving the administration of higher education programs, represents a congruent and proportional response to a history and pattern of unconstitutional disability discrimination by States and nonstate government entities. Nevertheless, the analysis employed by the Court in *Lane* must guide our analysis in this case.[8]

1.

We begin by identifying the Fourteenth Amendment right that Congress purportedly sought to enforce when it enacted Title II. *See Lane*, 124 S. Ct. at 1988. The Court in *Lane* recognized that Title II seeks to enforce the Fourteenth Amendment's "prohibition on irrational disability discrimination." 124 S. Ct. at 1988. Importantly, the Fourteenth Amendment does not forbid *all* discrimination based on disability. Because classifications based on disability are subject to minimal scrutiny, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985), States may make distinctions on the basis of disability so long as "there is a rational relationship between the dis-

---

[8]The defendants contend that this case is controlled by our decision in *Wessel v. Glendening*, 306 F.3d 203 (4th Cir. 2002), in which we held that Title II of the ADA does not abrogate the States' Eleventh Amendment immunity. In reaching this conclusion, we followed *Garrett* and limited our examination of the legislative history of Title II to evidence of "unconstitutional conduct by the states" and discounted other evidence of disability discrimination by nonstate entities. *Id.* at 210-13. While *Lane* specifically overrules *Wessel* only with respect to the application of Title II to cases involving the right of access to courts, the reasoning of *Lane* renders *Wessel* obsolete. Contrary to our conclusion in *Wessel* that "Congress did not have an adequate record of unconstitutional discrimination by states against the disabled to support abrogation," 306 F.3d at 213, the Court in *Lane* found that Congress enacted Title II of the ADA — considered as a whole — in response to a pattern of unconstitutional conduct by States and nonstate government entities, 124 S. Ct. at 1989-92. Moreover, *Lane* specifically rejects the proposition — crucial to our analysis in *Wessel* — that Congress may enact § 5 legislation only in response to unconstitutional conduct by the States themselves. *Id.* at 1991 n.16. For these reasons, *Wessel* does not control our analysis in this case.

parity of treatment and some legitimate governmental purpose," *Heller v. Doe*, 509 U.S. 312, 320 (1993). Thus, the Fourteenth Amendment does not require States to "make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett*, 531 U.S. at 367. This rule applies even in the context of public education. *See Plyler v. Doe*, 457 U.S. 202, 221-23 (1982) (recognizing the "pivotal role of education" in our society but noting that education is not a fundamental right, such that "a State need not justify by compelling necessity every variation in the manner in which education is provided to its population"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29-40 (1973) (recognizing the "undisputed importance of education" but rejecting the argument that education is a fundamental right and applying rational-basis review to an equal-protection challenge to a State's system of school financing); *Sellers v. School Bd. of Manassas, Va.*, 141 F.3d 524, 531 (4th Cir. 1998) (stating that a plaintiff challenging the disparate treatment of disabled students "would have to prove that a school board's decision was without any rational basis").

2.

We next consider the extent to which Title II was "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. According to Congress, this provision was necessary to address pervasive discrimination "in such critical areas as . . . housing, public accommodations, *education*, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3) (emphasis added).

At this stage of the analysis, we consider whether Title II represents a legislative response to a pattern of unconstitutional disability discrimination in public "services, programs, or activities" generally. Although the Court in *Lane* cited examples of disability discrimination specifically with respect to unjustified commitment, abuse and neglect of persons committed to mental health hospitals, and irrational

zoning decisions, 124 S. Ct. at 1989, as well as discriminatory state laws concerning marriage, jury service, the penal system, public education, and voting, *id.* at 1989-90, it was the cumulative effect of this evidence that mattered most. In light of all of this evidence, the Court found it "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.* at 1992. After *Lane*, it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services. This conclusion is sufficient to satisfy the historical inquiry into the harms sought to be addressed by Title II.[9] *See Miller v. King*, 384 F.3d 1248, 1271 n.25 (11th Cir. 2004) (noting that although "there was little documentation of a history and pattern of disability discrimination in prisons recited in *Lane*, . . . the Supreme Court in *Lane* in effect decided the . . . inquiry as to Title II"); *see also Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005) (agreeing with *Miller*).

3.

The remaining question is whether the remedial measures contained in Title II represent a congruent and proportional response to this demonstrated history and pattern of unconstitutional disability discrimination. *Lane*, 124 S. Ct. at 1992. Following *Lane*, we consider the remedial measures of Title II *only* as they apply to the class of cases implicating the right to be free from irrational disability discrimination in public higher education. *See id.* at 1992-94. Because the holding in *Lane* was limited to applications of Title II involving the fundamental right of access to courts — a Fourteenth Amendment right triggering heightened scrutiny — that holding does not control this case. *See id.* at 1994 n.20 (stating that "we need not consider whether Title II's duty to accommodate exceeds what the Constitution

---

[9]Although the Court's general conclusion on this point is sufficient to satisfy the historical inquiry into the purpose of the enactment of Title II, we note that the Court specifically identified public education as one of a number of "public services, programs, and activities" in which there was a documented pattern of unequal treatment. 124 S. Ct. at 1989.

requires in the class of cases that implicate only *Cleburne*'s prohibi-tion on irrational discrimination").[10]

Title II forbids public entities — including State and local govern-ments and their departments, agencies, or instrumentalities, 42 U.S.C. § 12131(1) — from excluding disabled persons from programs, ser-vices, or benefits "by reason of" their disabilities. 42 U.S.C. § 12132. In the context of public higher education, Title II requires that dis-abled students not be excluded from educational programs or activi-ties, or otherwise discriminated against, because of their disabilities. Title II also imposes an affirmative obligation to make "reasonable modifications to rules, policies, or practices, the removal of architec-tural, communication, or transportation barriers, or the provision of auxiliary aids and services" to enable disabled persons to receive ser-vices or participate in programs or activities. *Id.* § 12131(2). In the context of public higher education, Title II requires state colleges and universities to make reasonable accommodations for disabled students to ensure that they are able to participate in the educational program. These provisions, taken together, target precisely the sort of discrimi-nation that the evidentiary record described and that Congress sought to address.

We must also consider the limitations that Congress placed on the scope of Title II. *See Hibbs*, 538 U.S. at 738-39; *City of Boerne*, 521

---

[10]Although *Garrett* implicates the prohibition on irrational discrimina-tion, it does not control this case either. The Court in *Garrett* held that Title I of the ADA is not valid § 5 legislation because there was no dem-onstrated pattern of unconstitutional employment discrimination by the States against the disabled. 531 U.S. at 368-72. In *dicta*, the Court stated that "[e]ven were it possible to squeeze out of these examples a pattern of unconstitutional discrimination by the States," the remedial provisions of Title I would raise serious congruence-and-proportionality concerns. *Id.* at 372. The Court declined to address the constitutional question with respect to Title II, however, and noted specifically that Title II "has somewhat different remedial provisions from Title I." *Id.* at 360 n.1. Moreover, the congruence and proportionality of Title II must be mea-sured against a record of unconstitutional discrimination that is "clear beyond peradventure," *Lane*, 124 S. Ct. at 1992, while Title I was con-sidered in light of a record that had to be "squeezed out," *Garrett*, 531 U.S. at 372.

U.S. at 533. First, Title II protects only a "qualified individual with a disability." A plaintiff must make this threshold showing before he or she can even invoke the nondiscrimination provisions of the statute. Second, although Title II forbids discrimination based on a person's disability, States remain free to limit participation in their programs or activities for other, lawful reasons. Third, the requirement that public entities make "reasonable modification[s]" to accommodate disabled citizens is limited in important respects. As the Court noted in *Lane*, "Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs." 124 S. Ct. at 1993. Insofar as Title II requires States to make "reasonable" modifications to their educational programs in order to ensure that disabled citizens have access to those programs, this requirement is congruent with the constitutional imperative that States avoid *irrational* discrimination. *See Garrett*, 531 U.S. at 367.

Moreover, the implementing regulations provide the States several avenues to avoid liability under Title II. Since the States are required to operate their public programs so that those programs, "when viewed in [their] entirety," are accessible to and usable by disabled citizens, they are not necessarily required to "make each of [their] existing facilities accessible to and usable by individuals with disabilities," nor are they required to "take any action that would threaten or destroy the historic significance of an historic property." 28 C.F.R. § 35.150(a). Numerous alternatives are available for the States to consider in determining how to modify existing facilities to accommodate their disabled citizens. *Id.* § 35.150(b). Importantly, a State need not undertake what is probably the most expensive enterprise — structural changes in existing physical facilities — if other methods effectively make the program or service accessible. *Id.* Congress specifically found that such other methods of accommodation are less burdensome on public entities than are structural modifications of physical facilities. *See* S. Rep. No. 101-116, at 10-12, 89, 92 (1989); H.R. Rep. No. 101-485, pt. 2, at 34 (1990).

More generally, the States retain the right not to "take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial

and administrative burdens." 28 C.F.R. § 35.150(a). This regulation acknowledges the States' interests in preserving the essential characteristics of their public programs and monitoring public expenditures. The Court has noted that the "fundamental alteration" provision allows a State to "show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 604 (1999) (interpreting 28 C.F.R. § 35.130(b)(7)).

Undoubtedly, Title II imposes a greater burden on the States than does the Fourteenth Amendment. *See Garrett*, 531 U.S. at 367 (noting that under *Cleburne*, States are "not required by the Fourteenth Amendment to make special accommodations for the disabled"). Yet Title II and its implementing regulations limit the scope of liability in important respects and thus minimize the costs of compliance with the statute. *See City of Boerne*, 521 U.S. at 534 (stating that congruence-and-proportionality concerns are most acute where compliance with the federal statute entails "substantial costs" that "far exceed any pattern or practice of unconstitutional conduct"). These limitations "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Id.* at 533.

Title II presents fewer congruence-and-proportionality concerns than does Title I, which the Court in *Garrett* ruled was invalid § 5 legislation. First, the remedial measures described in Title I are aimed at discrimination by public entities acting as employers, not as sovereigns. The Court in *Garrett* noted that "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities." 531 U.S. at 372. Yet the Court has also noted (in a different context) that a State's "interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 675 (1994). Thus, it is more likely that disability discrimination in the context of a State's operation of public education programs will be unconstitutional than discrimination in the context of public employment.[11] Second, the

---

[11]We also note, as the Court in *Garrett* did, that Congress enacted the ADA in response to a finding that "[d]iscrimination still persists in such

remedial measures employed in Title II are likely less burdensome to the States than those employed in Title I. Whereas Title I requires the States to "mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities," 42 U.S.C. §§ 12112(5)(B), 12111(9), Title II imposes no such categorical requirement. Indeed, the regulations specifically permit the States to avoid making structural modifications to existing facilities in several circumstances. *See* 28 C.F.R. § 35.150(a).

The remedial measures employed in Title II may not be a perfect fit for the pattern of discrimination that Congress sought to remedy and deter, but they need not be. The Court has made it clear that prophylactic legislation such as Title II "can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne*, 521 U.S. at 518. Thus, the question is not *whether* Title II exceeds the boundaries of the Fourteenth Amendment, but *by how much*. Considering the pattern of unconstitutional disability discrimination described by the Court in *Lane*, we cannot say that Title II is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532. Accordingly, we conclude that Title II of the ADA is valid § 5 legislation, at least as it applies to public higher education. *See*

---

critical areas as *employment in the private sector*, public accommodations, public services, transportation, and telecommunications." 531 U.S. at 371. *See also id.* (noting that Congress found that "there exists a compelling need to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of employment in the private sector, public accommodations, public services, transportation, and telecommunications"). This finding was crucial to the Court's conclusion that there was not a demonstrated pattern of disability discrimination in public-sector employment that warranted § 5 legislation. *Garrett*, 531 U.S. at 372. The same finding shows that Congress recognized a persistent problem in private-sector employment and a separate problem in the provision of public services. Thus, the remedial measures described in Title I and those described in Title II were enacted in response to different kinds of problems, and a conclusion about the congruence and proportionality of Title I does not control the analysis of Title II.

*Association for Disabled Americans, Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005). Because Congress clearly expressed its intention to abrogate the States' Eleventh Amendment immunity, and did so pursuant to a valid exercise of constitutional authority, the Eleventh Amendment poses no bar to Constantine's claims under Title II of the ADA.

IV.

In addition to her ADA claim, Constantine also alleges that GMU, a recipient of federal funds, violated § 504 of the Rehabilitation Act when it discriminated against her on the basis of her disability. *See* 29 U.S.C. § 794(a) (prohibiting disability discrimination in federally funded programs or activities). In response to the defendants' Eleventh Amendment defense, Constantine contends that GMU waived its immunity when it accepted federal funds.

A State may waive its Eleventh Amendment immunity and consent to suit in federal court. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). "Generally, we will find a waiver either if the State voluntarily invokes [federal] jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to [federal] jurisdiction." *Id.* at 675-76 (internal quotations and citations omitted). More specifically, we have recognized two ways in which a State may waive its Eleventh Amendment immunity: (1) expressly in a state statute or constitutional provision, "as long as the provision explicitly specifies the state's intention to subject itself to suit in federal court," or (2) implicitly "by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs . . . on a State's consent to waive its constitutional immunity." *Litman v. George Mason Univ.*, 186 F.3d 544, 550 (4th Cir. 1999).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, any "program or activity" — including all the operations of a university or other postsecondary institution, *id.*

§ 794(b)(2)(A) — that receives federal funding must not discriminate on the basis of disability. Section 504 is enforceable through private causes of action, *Barnes v. Gorman*, 536 U.S. 181, 185 (2002), and the States are not immune from federal suits to enforce this provision, 42 U.S.C. § 2000d-7. Section 2000d-7 provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."

Like Title VI of the Civil Rights Act and Title IX of the Education Amendments, § 504 of the Rehabilitation Act "invokes Congress' power under the Spending Clause, U.S. Const. art. I., § 8. cl. 1, to place conditions on the grant of federal funds." *Barnes*, 536 U.S. at 186. Such Spending Clause legislation is "much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* (internal quotations omitted). Although Congress may exercise its spending power to impose such conditions, it must meet certain requirements in doing so: (1) "the exercise of the spending power must be for the general welfare," (2) the conditions must be stated unambiguously, (3) the conditions must "bear some relationship to the purpose of the federal spending," (4) the expenditure with its conditions must not violate some other constitutional command, and (5) "the financial inducement offered by Congress must not be so coercive as to pass the point at which pressure turns into compulsion." *Litman*, 186 F.3d at 552-53.

We held in *Litman* that the Eleventh Amendment waiver condition in § 2000d-7, in the context of a Title IX action, represented a valid exercise of the spending power. *Id.* at 555. Specifically, we concluded that § 2000d-7 is an unambiguous and unequivocal condition requiring waiver of Eleventh Amendment immunity, *id.* at 554, and that such a condition does not violate any other constitutional command, *id.* at 555. Because § 2000d-7 applies equally to § 504 cases and Title IX cases, our holding in *Litman* forecloses GMU's initial argument that Congress may not exercise its spending power to condition receipt of federal funds on a waiver of Eleventh Amendment immu-

nity. *Litman* does not address, however, the defendants' additional arguments that (1) the waiver condition is not related to the purpose of the federal spending, (2) the waiver condition is unduly coercive, and (3) any waiver was not knowing because GMU did not believe it had any immunity to waive when it accepted federal funds.

A.

The Supreme Court has acknowledged that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal quotations omitted). At issue in *South Dakota* was a federal statute conditioning receipt of federal highway funds on a State's adoption of a minimum drinking age of 21. *Id.* at 205. Given indications in the legislative history that the lack of uniformity in minimum drinking ages adversely affected highway safety, the Court noted that "the condition imposed by Congress is directly related to one of the main purposes for which highway funds are expended — safe interstate travel." *Id.* at 208-09. Although *amici* urged adoption of a rule holding that any condition must be related directly to the purpose of the particular expenditure to which it is attached, the Court declined to "define the outer bounds of the 'germaneness or relatedness' limitation on the imposition of conditions under the spending power." *Id.* at 208 n.3.

The defendants argue that the waiver condition at issue here is invalid because it is not related to any *particular* spending program; rather, the waiver condition applies to any program or activity that accepts federal funds for *any* purpose. That much is true, but the Supreme Court has upheld other spending conditions equally broad. *See, e.g., Lau v. Nichols*, 414 U.S. 563, 569 (1974) (upholding the ban on race discrimination in federally funded programs under Title VI of the Civil Rights Act);[12] *Sabri v. United States*, 124 S. Ct. 1941, 1946 (2004) (upholding a ban on bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, even without

---

[12]Although the Court subsequently rejected the interpretation of § 601 of the Civil Rights Act described in *Lau, see Alexander v. Sandoval*, 532 U.S. 275, 285 (2001), the Spending Clause analysis in *Lau* remains intact.

a requirement that the alleged bribe be related to specific federal funds). As the Court stated in *Lau*, Congress may, under the spending power, "requir[e] that public funds, to which all taxpayers . . . contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in . . . discrimination." 414 U.S. at 569 (internal citation omitted); *see also Sabri*, 124 S. Ct. at 1947 (stating that "[t]he power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place").

Although the waiver condition in § 2000d-7 is a blanket condition that applies regardless of the nature or amount of federal funds accepted, in this context it applies only with respect to the "program or activity" that receives those funds. *See* 29 U.S.C. § 794 (a)-(b). We conclude that this waiver condition is sufficiently related to the purpose of the nondiscrimination rule stated in § 504 of the Rehabilitation Act, *i.e.*, to ensure that federal funds are not used to facilitate disability discrimination. *See Barbour v. Washington Metro. Area Transit Auth.*, 374 F.3d 1161, 1168-69 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1591 (2005); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003); *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002); *Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002).

B.

The Supreme Court has also noted that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *South Dakota*, 483 U.S. at 211 (internal quotations omitted). The Court in *South Dakota* concluded that the minimum-drinking-age condition on highway funding was not unduly coercive, at least as it applied to South Dakota, since "all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs." *Id.* at 211. Although there might be a federal funding condition that is unconstitutionally coercive, neither the Supreme Court nor any federal court of appeals has yet identified one.

We considered this coercion theory in *Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997) (*en banc*). The Com-

monwealth of Virginia challenged the federal government's decision to withhold from Virginia all federal funding under the Individuals with Disabilities Education Act ("IDEA") for one year in response to Virginia's failure to provide educational services to 126 disabled students who had been disciplined for reasons unrelated to their disabilities. *Id.* at 560. A majority of the *en banc* court sustained Virginia's challenge on the ground that the IDEA does not unambiguously condition receipt of federal funds on provision of services under such circumstances. *Id.* at 561.

Although it was not necessary to the disposition of the case, six of thirteen judges agreed that the federal government's withholding 100% of an annual special education grant of $60 million in response to the Commonwealth's failure to provide private educational services to 126 students was unduly coercive. *Id.* at 569-70. According to these judges, "a Tenth Amendment claim of the highest order lies where, as here, the Federal Government . . . withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to policy dictates of Washington in a matter peculiarly within their powers as sovereign States." *Id.* at 570.

We later characterized this *dicta* in *Riley* as indicating that "the coercion theory remains viable in this circuit, and that federal statutes that threaten the loss of an entire block of federal funds upon a relatively minor failing by a state are constitutionally suspect." *West Va. v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 291 (4th Cir. 2002). The State of West Virginia challenged, on Tenth Amendment grounds, the constitutionality of certain provisions in the federal Medicaid statute that required the State to adopt a program to recover certain expenditures from the estates of deceased Medicaid beneficiaries. *Id.* at 283-84. West Virginia argued that this requirement was unduly coercive because the State stood to lose more than $1 billion in federal Medicaid funds each year if it failed to implement an estate recovery program that would generate only about $2 million each year. *Id.* at 291. Because the federal government had not, in fact, withheld or threatened to withhold the State's entire Medicaid grant, we treated West Virginia's argument as a facial challenge to the requirement that States implement estate recovery programs. *Id.* at 292. We upheld the statute on the ground that it gives the Secretary

of Health and Human Services discretion to impose a penalty for non-compliance that is less severe than withholding 100% of a State's Medicaid funding. *Id.* at 292-93.[13]

The waiver condition at issue here is unambiguous and unequivocal: If a "program or activity" — here, GMU — accepts federal funding, then it may not assert Eleventh Amendment immunity in defense against a claim for violation of § 504. While it is certainly true, as the defendants contend, that this waiver condition operates whenever a "program or activity" accepts *any* federal funds, that fact alone does not compel the conclusion that such a program or activity was coerced to accept the condition. The coercion inquiry focuses on the "financial inducement offered by Congress," and the Court in *South Dakota* held that the minimum-drinking-age condition was not unduly coercive based on the relatively small size of the federal grant that the State risked losing. 483 U.S. at 211 (noting that the State would lose only 5% of available federal highway funds if it opted not to accept the condition). In this case, GMU has offered no estimate of the degree to which it actually relies upon federal funds, and we will not simply presume that the State's capacity for free choice was overcome by the prospect of financial assistance from the federal government. *See id.* Based on the record before us, we cannot say that the financial inducement of federal funding was so great as to coerce GMU's acceptance of the waiver condition in § 2000d-7. In sum, we conclude that GMU waived its Eleventh Amendment immunity with respect to Constantine's claims for damages under § 504 of the Rehabilitation Act.

## C.

The defendants contend, however, that more is required to demonstrate that a State knowingly waived its Eleventh Amendment immunity. According to the defendants, a waiver of immunity is valid only if the State subjectively believed that it had immunity to waive. Relying upon the Second Circuit's decision in *Garcia v. SUNY Health Sci-*

---

[13]We did note, however, that "[i]f the government in fact withheld the entirety of West Virginia's [Medicaid funding] because of the [S]tate's failure to implement an estate recovery program, then serious Tenth Amendment questions would be raised." *Id.* at 291.

*ences Center*, 280 F.3d 98 (2d Cir. 2001), the defendants argue that GMU's waiver was not "knowing" because it reasonably believed that Congress had already abrogated its immunity from suit under § 504 of the Rehabilitation Act.

The Second Circuit held in *Garcia* that New York had not knowingly waived its Eleventh Amendment immunity to a suit under § 504 because at the time it accepted federal funds for the program at issue, *i.e.*, before the Supreme Court decided *Seminole Tribe*, "Title II [of the ADA] was reasonably understood to abrogate New York's sovereign immunity under Congress' Commerce Clause authority." *Id.* at 114. Because § 504 is virtually identical to Title II of the ADA, the Second Circuit concluded that New York at that time had no immunity to § 504 suits that it could possibly waive. Thus, its acceptance of federal funds expressly conditioned on a waiver of Eleventh Amendment immunity did not, in fact, constitute a knowing waiver. *Id.* at 114-15.

We decline to follow the Second Circuit's approach in *Garcia*. The Supreme Court has already held that a condition on federal spending must be clearly and unambiguously expressed so that the State accepting federal funds can be certain of its obligations upon receipt of such funds. *South Dakota*, 483 U.S. at 207 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), for the proposition that an unambiguous condition "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation" in the federal funding program). The Court has further held that Congress may not coerce the States into accepting federal funds with conditions. *Id.* at 211. These requirements suffice to ensure that a State's agreement to federal funding conditions is both knowing and voluntary. *See Pace v. Bogalusa City Sch. Bd.*, ___ F.3d ___, 2005 WL 546507, at *6-*9 (5th Cir. Mar. 16, 2005) (*en banc*); *Barbour*, 374 F.3d at 1166-68; *Doe v. Nebraska*, 345 F.3d 593, 601-02 (8th Cir. 2003); *Garrett v. University of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292-93 (11th Cir. 2003) (*per curiam*); *M.A. v. State-Operated Sch. Dist.*, 344 F.3d 335, 349-51 (3d Cir. 2003). The Court has never suggested that anything more than voluntary acceptance of federal funds in the face of an unambiguous waiver condition is required to demonstrate a State's knowing agreement to that condition. *See College Sav. Bank*, 527 U.S. at 686 (characterizing *South*

*Dakota* as holding that "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions").[14]

In any event, the facts of this case do not support the defendants' argument that GMU did not know it had any Eleventh Amendment immunity to waive when it accepted federal funds. When GMU accepted federal funds in 2003 — the year during which Constantine's claims arose — it was already settled that Congress had no authority under Article I, and only limited authority under § 5 of the Fourteenth Amendment, to abrogate the States' Eleventh Amendment immunity. *See City of Boerne*, 521 U.S. at 517-20; *Seminole Tribe*, 517 U.S. at 72-73. By that time, the Supreme Court had specifically rejected Congress' attempts to abrogate Eleventh Amendment immunity with respect to Title I of the ADA and the ADEA. *See Garrett*, 531 U.S. at 374; *Kimel*, 528 U.S. at 91. The Court had made no pronouncement concerning abrogation under the Rehabilitation Act. In short, when GMU accepted federal funds in 2003, it was far from clear that Congress had validly abrogated Eleventh Amendment immunity with respect to suits brought under § 504. Even the Second

---

[14]Contrary to the defendants' argument, *College Savings Bank* does not compel the conclusion that GMU's waiver of immunity was unknowing. That case presented the question whether a State retains its Eleventh Amendment immunity to suit brought under the Trademark Remedy Clarification Act ("TRCA"), even after the State engages in advertising activities regulated by the Lanham Act. Expressly rejecting the doctrine of constructive waiver, the Court held that a State cannot be deemed to have waived its immunity merely by engaging in otherwise lawful conduct. *Id.* at 680-87. For present purposes, it is important that the Court specifically distinguished conditional-spending cases such as *South Dakota*: "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity." *Id.* at 686-87. Because this case does not involve a constructive waiver at all, but involves the State's voluntary receipt of federal funds expressly conditioned on a waiver of Eleventh Amendment immunity, *College Savings Bank* is inapposite.

Circuit in *Garcia* recognized that "an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity. This is because a state deciding to accept the funds would not be ignorant of the fact that it was waiving its possible claim to sovereign immunity." 344 F.3d at 114 n.4. GMU waived whatever Eleventh Amendment immunity it had when it accepted federal funds under a statute that clearly and unambiguously conditioned receipt of such funds on a waiver of immunity.

V.

Constantine also seeks declaratory and injunctive relief under § 504 of the Rehabilitation Act, and the defendants again assert Eleventh Amendment immunity.[15] The Supreme Court held in *Ex parte Young*, 209 U.S. 123 (1908), that the Eleventh Amendment does not bar a suit against a State official for prospective injunctive relief. In order to determine whether this doctrine applies, we "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 645 (2002) (internal quotations omitted). We do not consider the merits of the plaintiff's claims; it is enough that the complaint *alleges* an ongoing violation of federal law. *Id.* at 646.

Constantine's complaint alleges that the defendants violated § 504 of the Rehabilitation Act by initially failing, and then later refusing, to make reasonable accommodations for her disability. The prayer for relief requests an order expunging the failing grade from Constantine's record or directing GMU to permit a re-examination under reasonable circumstances. The defendants do not contend that such relief would be impermissibly retroactive. Accordingly, the allegations in

---

[15]Since Constantine graduated from GMU's law school, all of her claims for injunctive relief are now moot, except for her request that GMU expunge the failing grade from her record. *See Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) (citing *Board of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129 (1975) (*per curiam*)).

Constantine's complaint satisfy our "straightforward inquiry." *Id.* at 645-46; *see McCarthy v. Hawkins*, 381 F.3d 407, 417 (5th Cir. 2004).

The defendants argue, however, that the Rehabilitation Act effectively precludes *Ex parte Young* actions. Congress may displace the *Ex parte Young* doctrine by creating specific remedies for violations by state actors. "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe*, 517 U.S. at 74. The Court in *Seminole Tribe* held that an *Ex parte Young* action was not appropriate in light of the comprehensive remedial scheme provided in the Indian Gaming Regulatory Act ("IGRA"). Where a court finds that a State breached its statutory duty to negotiate in good faith with an Indian tribe, the IGRA provides for a sort of forced mediation between the parties with the prospect of federal regulation in the event of an impasse. *Id.* at 74-75. This "quite modest set of sanctions" evidenced Congress' intent to limit the States' exposure for violations of the statute, whereas an *Ex parte Young* action would leave the States vulnerable to "the full remedial powers of a federal court." *Id.* at 75. Thus, the Court held that an *Ex parte Young* action is not appropriate to enforce the IGRA. *Id.* at 76.

By contrast, the Court held in *Verizon* that the Telecommunications Act of 1996 did not foreclose an *Ex parte Young* action. 535 U.S. at 647-48. That statute merely provides that an aggrieved party may sue in federal court to challenge certain determinations made by state commissions; it does not identify the proper party to be sued, nor does it restrict in any way the kinds of relief available. *Id.* at 647. Merely authorizing federal courts to review commission decisions under the statute does not "impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*." *Id.* at 647-48.

For violations of § 504, the Rehabilitation Act makes available all of the "remedies, procedures, and rights" provided in Title VI of the Civil Rights Act. 29 U.S.C. § 794a(a)(2). Title VI forbids discrimination on the basis of race, color, or national origin by any "program or activity" that receives federal funding. 42 U.S.C. § 2000d. Although

Title VI does not expressly authorize a private right of action to enforce this nondiscrimination rule, "[i]t is well settled that there is an implied private right of action to enforce [the statute's] core prohibition on discrimination in federally-financed programs." *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003). In any suit against a State for violation of Title VI, "remedies (including remedies both at law and in equity) are available . . . to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d-7(a)(2). "Title VI mentions no remedies" at all, and it certainly does not purport to limit the remedies available in a suit against a defendant other than a State. *Barnes*, 536 U.S. at 187.[16] Thus, we conclude that the Rehabilitation Act (which incorporates the remedies provided in Title VI) does not suggest a congressional intent to foreclose an *Ex parte Young* action for violation of § 504. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 288-89 (2d Cir. 2003); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1188-89 (9th Cir. 2003); *Randolph v. Rodgers*, 253 F.3d 342, 346-49 & n.13 (8th Cir. 2001).

## VI.

Because the Eleventh Amendment does not bar Constantine's claims under the ADA and the Rehabilitation Act, we next consider the district court's dismissal of those claims under Rule 12(b)(6). Dismissal is not appropriate under Rule 12(b)(6) "unless it appears certain that the plaintiff can prove no set of facts which would support [her] claim and would entitle [her] to relief." *Mylan Labs.*, 7 F.3d at 1134. Our review is *de novo*, and we "accept as true all well-pleaded allegations and . . . view the complaint in a light most favorable to the plaintiff." *Id.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from partici-

---

[16]The Court in *Barnes* held that punitive damages are not available for violation of Title VI, and thus not available for violation of Title II of the ADA or § 504 of the Rehabilitation Act either. 536 U.S. at 189. Importantly, the Court based this conclusion on the fact that punitive damages ordinarily are not available in breach-of-contract actions. *Id.* at 188. The same cannot be said of prospective injunctive relief.

pation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In general, a plaintiff seeking recovery for violation of either statute must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir. 1999); *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 & n.9 (4th Cir. 1995).[17] The district court ruled that Constantine's complaint failed to allege facts showing that (1) Constantine was "otherwise qualified" as a law student or (2) she was actually denied the benefits of an educational program or service.[18]

A plaintiff is "qualified" if she is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). According to the complaint, Constantine "is qualified to be a student at GMU and is

---

[17]Although "[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements," we have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are "significantly dissimilar." *Baird*, 192 F.3d at 469. A plaintiff seeking relief under Title II of the ADA must prove that disability "played a motivating role" in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was "solely by reason" of the plaintiff's disability. *Id.* at 469-70.

[18]Neither the district court nor the defendants on appeal have asserted that Constantine's complaint fails adequately to allege causation. Indeed, the complaint fairly may be read to allege that the defendants discriminated against Constantine because of her disability.

able to perform all the essential functions of being a student with reasonable accommodations. If she received additional time as a reasonable accommodation for her disability, she would not have any problem complying [with] GMU's examination policy." J.A. 16. The complaint further alleges that Constantine carried a full load of law school courses in the spring of 2003 and completed her other final exams "without incident." J.A. 12. Taken together, these allegations are sufficient to make a *prima facie* case that Constantine, with reasonable modifications to exam administration policies or practices, met the essential eligibility requirements for participation in GMU's law school programs.

Under the disability discrimination statutes, a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, *or* subjected to discrimination by that entity. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Constantine's complaint alleges that she was unable to complete Professor Lund's exam because of her disability; that the defendants initially refused to accommodate her disability by giving her additional time to complete the exam, resulting in her failing the exam; that when the defendants agreed months later to allow a re-examination, they gave her only three days to prepare; that when she alerted the defendants to a conflict with other law school responsibilities, they refused to alter the date for re-examination; and that when she sought a temporary restraining order to prevent the re-examination on the date set by the defendants, they determined that she would fail any subsequent re-examination. If these allegations are true, then Constantine can demonstrate that the defendants excluded her from meaningful participation in Professor Lund's course or denied her the benefits of that course, or at least discriminated against her with respect to that course. Whatever may happen at summary judgment or trial, these allegations are sufficient to satisfy Rule 12(b)(6).

VII.

Constantine also asserts a claim against the individual defendants for First Amendment retaliation in violation of 42 U.S.C. § 1983. Specifically, Constantine alleges that the defendants violated her First Amendment right to free speech by retaliating against her after she

complained about Professor Lund's constitutional law exam and GMU's grade appeals policies.

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct. *Id.* at 686.

### A.

Constantine alleges that she complained to GMU officials about the construction of Professor Lund's exam and the procedures available to challenge her grade. She then repeated her complaints about the grade appeals process in an article printed in the law school newspaper. It is undisputed that Constantine engaged in protected First Amendment activity. *See Trulock v. Freeh*, 275 F.3d 391, 404-05 (4th Cir. 2001) (holding that the plaintiff adequately alleged First Amendment retaliation based on government officials' response to his publication of an article criticizing the FBI and other federal agencies).

### B.

Constantine further alleges that GMU, in response to these complaints, (1) denied her initial request to re-take the exam, (2) denied her request to have a different professor determine whether the original exam was defective or graded unfairly, and (3) refused to grant her a hearing before the Academic Standing Committee to challenge her grade. The district court ruled, without any explanation, that the defendants' conduct did not adversely affect Constantine's First Amendment rights. The defendants contend that this ruling was correct because the complaint fails to allege that their actions actually prevented Constantine from exercising her First Amendment rights.

First Amendment retaliation is actionable because "retaliatory actions may tend to chill individuals' exercise of constitutional

rights." *ACLU of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993). Not all retaliatory conduct tends to chill First Amendment activity, however, *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995), and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a "*de minimis* inconvenience" to her exercise of First Amendment rights, *ACLU of Md.*, 999 F.2d at 786 n.6. Of course, conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, and a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation. *Id.*

We reject the defendants' suggestion that this inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff. We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely. Moreover, such a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight. We believe that an objective standard better instructs public officials as to their obligations under the First Amendment. Thus, for purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter "a person of ordinary firmness" from the exercise of First Amendment rights. *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir. 2001); *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *cf. Suarez Corp.*, 202 F.3d at 688 (noting that retaliatory disclosure of information may constitute adverse action if it is "sufficiently embarrassing, humiliating, or emotionally distressful" and citing *Bloch*'s "ordinary firmness" standard). While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.

Constantine alleges that in response to her public criticism of Professor Lund's exam and GMU's grade appeals policies, the defen-

dants denied her requests to sit for a re-examination, to have another professor review her original exam, and even to have a hearing before an administrative committee. When the defendants finally allowed a re-examination, they gave Constantine only three days' notice and, according to the complaint, determined in advance that she would receive a failing grade. Because such conduct would tend to chill a reasonable person's exercise of First Amendment rights, we conclude that Constantine has adequately alleged adverse action.

## C.

Finally, Constantine must allege a causal connection between her First Amendment activity and the alleged adverse action. In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). "Knowledge alone, however, does not establish a causal connection" between the protected activity and the adverse action. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). There must also be some degree of temporal proximity to suggest a causal connection. "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657.

The complaint alleges that Constantine made her complaints personally to several of the defendants and other GMU officials. The complaint also describes (somewhat vaguely) a chronology of events spanning roughly four months from the date of the initial exam to the filing of this lawsuit. Constantine initially took Professor Lund's exam in January 2003. Sometime later — the complaint does not specify the date — Constantine complained about the exam, and sometime after that she complained about the grade appeals process. For three months, the defendants made no response to Constantine's complaints. When they finally agreed to discuss these issues with Constantine, the defendants told her that she could re-take the exam "sometime in June." Then on May 17, 2003, the defendants notified Constantine that she would be allowed to sit for a re-examination on May 21, 2003. At most, four months elapsed from the time Constantine complained about Professor Lund's exam and the grade appeals

process to the time of the defendants' alleged retaliatory conduct. Although we noted that a nine-month lapse created a "very close question" as to causal connection in *Price*, we nevertheless concluded that the plaintiff's claim survived a motion to dismiss. 380 F.3d at 213. Likewise, we are satisfied that Constantine's complaint adequately alleges a causal connection between her First Amendment activity and the defendants' alleged misconduct.

## VIII.

We conclude that the Eleventh Amendment poses no bar to Constantine's claims because Congress validly abrogated the States' immunity to suit under Title II of the ADA; the State waived its immunity to suit under § 504 of the Rehabilitation Act with respect to GMU; and the *Ex parte Young* doctrine permits an action for prospective injunctive relief to remedy a violation of § 504. We further conclude that Constantine's complaint adequately alleges claims for disability discrimination in violation of Title II of the ADA and § 504 of the Rehabilitation Act, as well as a First Amendment retaliation claim under § 1983. Accordingly, we reverse the judgment of the district court and remand this case for further proceedings.[19]

*REVERSED AND REMANDED*

---

[19]Since the individual defendants have asserted qualified immunity as a defense to Constantine's First Amendment retaliation claim, the district court should address that issue as soon as practicable on remand. *See Saucier*, 533 U.S. at 201.